[No. B061743. Second Dist., Div. Two. Oct. 28, 1992.]

CALIFORNIA INSURANCE GUARANTEE ASSOCIATION, Petitioner, v. WORKERS' COMPENSATION APPEALS BOARD, IDA JENKINS et al., Respondents.

## COUNSEL

Lewis, D'Amato, Brisbois & Bisgaard, Raul L. Martinez, Cathey A. Stricker and Robert C. Hayden for Petitioner.

Dany Margolies, John Rea, John T. Revis and Albert Vieri for Respondents.

## OPINION

**NOTT, J.**—A workers' compensation judge (WCJ) determined that the California Insurance Guarantee Association (CIGA) was obligated to pay workers' compensation benefits awarded to an injured employee, Thomas Conces, after CIGA was called upon to meet the obligations of an insolvent workers' compensation carrier, Homeland Insurance Company (Homeland). The Workers' Compensation Appeals Board (Board) denied CIGA's petition for reconsideration. The WCJ and the Board ruled that Homeland was estopped to deny insurance coverage to Blue Jay Enterprises, Inc., the employer of the injured worker. CIGA contends, among other things, that the WCJ and the Board erred because CIGA has no statutory liability for (1) a claim against an insolvent insurer based on obligations created by estoppel to deny workers' compensation insurance coverage or (2) obligations of an insolvent insurer that allegedly arose because of the tortious negligence of an agent of the insolvent insurer.

The case presents issues of first impression. As we shall explain, we are unpersuaded by CIGA's contentions, and we affirm the Board's order denying reconsideration.

## FACTS

Ida Jenkins was the owner of Blue Jay Enterprises, Inc. (Blue Jay), a small business she had operated for 10 years with her husband, and for 5 years by herself after his death. Blue Jay, doing business as Aamco Transmission, repaired automobiles and had five mechanics working at all times. Blue Jay had always maintained workers' compensation insurance.

On March 19, 1987, Jenkins met with Robert Pixley, an insurance salesman, to obtain workers' compensation insurance. Jenkins had heard about Pixley from other Aamco Transmission dealers. Pixley was the owner of a 10 percent interest in The Factory Insurance Service, Inc. (Factory). Factory was an authorized agent of Homeland, and Pixley, as a Factory agent, was a subagent of Homeland.

Pixley filled out a document entitled "Workers' Compensation Application," based on information provided to him by Jenkins. The application was for Homeland's participating workers' compensation insurance policy and the box next to "issue" was checked.[1] The total estimated annual premium was $2,955. The proposed duration of the policy was from March 23, 1987, through March 23, 1988. Pixley took a $500 deposit from Jenkins. Pixley, rather than Jenkins, signed the application. Pixley told Jenkins she was "covered" and would receive a policy in the mail. Pixley deposited the $500 check in Factory's trust account.

On March 23, 1987, Pixley wrote a memorandum to Jill Belt, an underwriter at Homeland, stating: "App[lication] enclosed for Code 7397[.] [P]lease write seperate [sic] policy since this does not fit our group. Call if you need any more information."[2] Pixley put this memorandum in the outgoing mail basket at work. On April 29, 1987, Pixley drafted another memorandum to Belt at Homeland. It stated: "Per our phone conservation [sic][,] duplicate app[lication] enclosed. Please issue soon as possible. Thank you for your help." Again, Pixley placed the second memorandum and the duplicate application in the outgoing mail basket. Homeland has no record of receiving either the memoranda or the applications.

---

[1]Although Jenkins testified that she always employed five mechanics at her Aamco business, the application for workers' compensation insurance stated there were only four employees.

[2]Pixley testified "Code 7397" meant transmission businesses.

Rainy Earp, an underwriter at Homeland in 1987, testified that Factory's authority to bind Homeland was limited to a 10-day period. She further testified that in 1987 Homeland would not issue any insurance policy if the premium was less than $5,000 a year. Notice of this limitation was sent to Homeland's agents, but Earp had no personal knowledge that Factory received notice. There was also no evidence that Jenkins or Blue Jay was informed of the limitations on Factory's authority.

After March 19, 1987, Jenkins called Pixley at Factory 15 or 20 times because she had not received the workers' compensation insurance policy. Pixley never returned her calls, but Jenkins was always advised by other persons working at Factory that she should not worry because she was covered.

Homeland was later declared insolvent, and on September 12, 1987, all insurance policies of Homeland were cancelled by order of the Insurance Commissioner because Homeland had lost its reinsurance coverage. No notice of cancellation of policy was received by Blue Jay or Jenkins. Pixley did not notify Jenkins of Homeland's insolvency.

On September 24, 1987, Thomas Conces sustained injuries during his employment as a shop manager and mechanic by Blue Jay. Just after Conces was injured, Jenkins discovered that Homeland denied coverage and was insolvent as well. After Conces filed his application for workers' compensation benefits, Homeland, CIGA, and the Uninsured Employers Fund (UEF) were made parties in the ensuing litigation.

The WCJ found that Conces had sustained work-related injuries to the right lower extremity, left knee, low back, and psyche that resulted in temporary disability from October 26, 1987, through January 4, 1988. The WCJ also found the injuries resulted in continuing temporary disability since March 1, 1990. The WCJ ordered CIGA to pay temporary disability indemnity and to adjust self-procured medical expenses. The WCJ also ordered CIGA to provide further medical treatment for the right lower extremity and psyche.

The WCJ determined Homeland was estopped to deny coverage to Blue Jay and Jenkins, and CIGA was responsible for payment of Homeland's obligations that had been created by the estoppel. UEF was dismissed from the case. In the WCJ's opinion on decision, she stated: "Where no coverage occurs, without fault of the employer, through acts, omissions, or errors of agents of the insurer, acting within their actual or ostensible authority, the insurer is bound thereby and estopped to deny coverage. [Citation.]" The

WCJ pointed out that Jenkins had relied on Pixley's representations to her detriment. The WCJ cited three Board rulings wherein estoppel had been applied to establish workers' compensation insurance coverage for injured workers in similar situations.[3]

In response to other contentions of CIGA, the WCJ held that coverage was not precluded by the cancellation of Homeland's policies on September 12, 1987, because, in view of Pixley's negligence, there was no evidence that Blue Jay or Jenkins had received notice of cancellation. The WCJ stated that, had Jenkins received such notice, she would have secured other insurance. The WCJ concluded that CIGA's statutory obligation to pay only "covered claims" (Ins. Code, §§ 1063.1, 1063.2, 1063.12) did not prevent protection of Blue Jay and Jenkins, because covered claims were not, as CIGA contended, limited to only those arising from written and actually issued policies of insurance. The WCJ emphasized that covered claims were statutorily defined as the obligations of an insolvent insurer. The WCJ stated: "Although this is a case of first impression, I find that CIGA is liable for the benefits awarded in this matter. The definition of 'covered claims' is for 'obligations.' Had the Legislature wanted to define the term insurance policy to only include written and endorsed policies, it could have done so. To exclude claims because of the bumbling of an insurance agent with some binding authority, would undermine the whole purpose of CIGA[,] which is to provide protection for the public and not for insurance companies. [Citation.]"

CIGA sought reconsideration, contending that (1) the "covered claims" that CIGA is obligated to pay on behalf of insolvent insurers do not include claims created by estoppel; and (2) CIGA may not be held estopped to deny coverage based on Pixley's conduct, since payment of claims based on the tortious conduct of the insolvent insurer is specifically excluded from CIGA's statutory responsibilities. CIGA contended that the WCJ had erroneously interpreted the pertinent Insurance Code sections. The WCJ recommended denial of reconsideration, based on her conclusion that the statutory term "covered claims" was broad enough to include those created by estoppel to deny coverage. The WCJ also explained that CIGA's liability was based on Pixley's status as a binding agent for Homeland and that the assertion of his tortious negligence in handling the application of Blue Jay and Jenkins for workers' compensation insurance coverage was irrelevant.

---

[3]The cases on which the WCJ relied in finding estoppel were *Allstate Ins. Co.* v. *Workers' Comp. Appeals Bd.* (1980) 45 Cal.Comp.Cases 777, writ denied; *Fireman's Fund Ins. Co.* v. *Workers' Comp. Appeals Bd.* (1976) 41 Cal.Comp.Cases 588, writ denied; and *Fremont Indemnity Co.* v. *Workers' Comp. Appeals Bd.* (1976) 41 Cal.Comp.Cases 575, writ denied.

The WCJ noted that the California Constitution mandates full provision of adequate insurance coverage to secure the payment of workers' compensation, and she concluded the Insurance Code provisions regarding CIGA should be interpreted in light of that mandate.

The Board denied reconsideration, adopting the reasons stated in the WCJ's report without further discussion. CIGA's timely petition for writ of review followed.

CONTENTIONS

CIGA contends that it is not required to pay claims arising out of obligations created by estoppel to deny the existence of insurance coverage because (1) insurance obligations created by estoppel are not within the statutory definition of covered claims, and (2) liability for torts of the insolvent insurer has been excluded from the statutory definition of covered claims. In addition, CIGA raises several contentions that it failed to raise in its petition for reconsideration.

DISCUSSION

(1) *CIGA Is Estopped From Denying Coverage*

The Guarantee Act, which created CIGA, was enacted by the Legislature in 1969 to "provide insurance against loss arising from the failure of an insolvent insurer to discharge its obligations under its insurance policies. [Citations.]" (*Middleton* v. *Imperial Ins. Co.* (1983) 34 Cal.3d 134, 137 [193 Cal.Rptr. 144, 666 P.2d 1]; accord, *Carver* v. *Workers' Comp. Appeals Bd.* (1990) 217 Cal.App.3d 1539, 1545 [266 Cal.Rptr. 718].) Specifically, CIGA is charged with the responsibility of paying "covered claims." (Ins. Code, § 1063.2, subd. (a).)

CIGA is funded by insurance companies that do business in California. It was created to provide a limited form of protection for insureds and the public, not to provide a fund to protect insurance carriers. (*Carver* v. *Workers' Comp. Appeals Bd.*, *supra*, 217 Cal.App.3d at p. 1545; *California*

*Union Ins. Co.* v. *Central National Ins. Co.* (1981) 117 Cal.App.3d 729, 734 [173 Cal.Rptr. 35].)[4]

■ We consider first whether a claim created by estoppel can be a covered claim under the Guarantee Act. The term "covered claims" now set forth in Insurance Code section 1063.1, subdivision (c)(1), is substantially similar to the definition contained in that subdivision on the date of injury.

On the date of injury, Insurance Code section 1063.1, subdivision (c)(1), stated: " '*Covered claims*' *means the obligations of an insolvent insurer,* including the obligation for unearned premiums, (i) *imposed by law and arising out of an insurance policy of the insolvent insurer*; (ii) which were unpaid by the insolvent insurer; (iii) which are presented as a claim to the liquidator in this state or to the association on or before the last date fixed for the filing of claims in the domiciliary liquidating proceedings; (iv) which were incurred prior to, on, or within 30 days after the date the liquidator was appointed; (v) for which the assets of the insolvent insurer are insufficient to discharge in full; (vi) *in the case of a policy of workers' compensation insurance, to provide workers' compensation benefits under the Workers' Compensation Law of this state* and (vii) in the case of other classes of insurance if such policy is issued to a resident of this state or claim against an insured thereunder is made by a resident of this state." (Stats. 1984, ch. 564, § 1, p. 2203, italics added.) The statute did not further define what constituted a covered claim. In subdivisions (c)(2) through (c)(10) of section 1063.1, the Legislature stated in detail what was *excluded* from "covered claims." Among the exclusions were obligations arising from certain types of reinsurance obligations of the insolvent insurer, instances in which other coverage existed, and claims based on subrogation. The Legislature later added other exclusions from the definition of covered claims. A claim based on estoppel was not expressly excluded on the date of injury and has not subsequently been so excluded.[5] Our independent research of legislative intent materials has not revealed any basis for concluding that insurance

---

[4]The purpose of UEF is different from that of CIGA. UEF was created in 1971 "to ensure that workers who happen to be employed by illegally uninsured employers are not deprived of workers' compensation benefits . . . ." (Lab. Code, § 3716, subd. (b).) UEF was not created "as a source of contribution to insurance carriers, or self-insured, or legally insured employers. . . ." (*Ibid.*) Labor Code section 3715 et seq. set forth the procedures available to UEF to recoup from an uninsured employer the funds paid or to be paid by UEF to the injured employee. If Blue Jay and Jenkins are found to be uninsured, they ultimately will be responsible for any payments by UEF.

[5]On the date of injury, Insurance Code section 1063.1 provided in pertinent part: "As used in this article: . . . [¶] (c)(2) 'Covered claims' shall not include any obligations arising from life, title, surety, disability, credit, mortgage, or mortgage guaranty insurance, nor arising from

obligations arising from estoppel to deny coverage are excluded from covered claims.[6]

The principles governing statutory construction are well established. ■ "The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.] In order to determine this intent, we begin by examining the language of the statute. [Citations.] . . . '[T]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.' [Citation.]" (*People* v. *Pieters* (1991) 52 Cal.3d 894, 898-899 [276 Cal.Rptr. 918, 802 P.2d 420].)

■ It is also well established that CIGA does not "stand in the shoes" of the insolvent insurer for all purposes; rather, CIGA must determine

---

a policy of ocean marine insurance. [¶] (3) 'Covered claims' shall not include any obligations of the insolvent insurer arising out of any reinsurance contracts, nor any obligations incurred after the expiration date of the insurance policy or after the insurance policy has been replaced by the insured or canceled at the insured's request or after the insurance policy has been canceled by the association as provided in this chapter, nor any obligations to any state or to the federal government. [¶] (4) 'Covered claims' shall not include any obligations to insurers, insurance pools, or underwriting associations, except as otherwise provided in this chapter. [¶] (5) *'Covered claims,' except in the case of a claim for workers' compensation benefits, shall not include any claim in an amount of one hundred dollars ($100) or less, nor the first one hundred dollars ($100) of any claim in excess of one hundred dollars ($100), nor that portion of any claim which is in excess of any applicable limits provided in the insurance policy issued by the insolvent insurer.* [¶] (6) *'Covered claims' shall not include that portion of any claim, other than a claim for workers' compensation benefits, which is in excess of five hundred thousand dollars ($500,000).* [¶] (7) 'Covered claims' shall not include (a) any claim to the extent it is covered by any other insurance of a class covered by the provisions of this article available to the claimant or insured nor (b) any claim by any person other than the original claimant under the insurance policy in his or her own name, his or her executor, administrator, guardian or other personal representative or trustee in bankruptcy and shall not include any claim asserted by an assignee or one claiming by right of subrogation, except as otherwise provided in this chapter. [¶] (8) 'Covered claims' shall not include any obligations arising out of the issuance of an insurance policy written by the separate division of the State Compensation Insurance Fund pursuant to the provisions of Sections 11802 and 11803. [¶] (9) 'Covered claims' shall not include any obligations of the insolvent insurer arising from any policy or contract of insurance issued or renewed prior to the insolvent insurer's admission to transact insurance in the State of California. [¶] (10) 'Covered claims' shall not include surplus deposits of subscribers as defined in Section 1374.1. . . ." (Stats. 1984, ch. 564, § 1, pp. 2203-2204, italics added.)

[6]When legislative analysis was prepared in 1984 concerning amendment of the act to exclude stipulated judgments from "covered claims," the analysis of the Department of Insurance stated that the term "covered claims" was "variously defined." (Cal. Dept. Ins., Analysis of Assem. Bill No. 2656 (Feb. 10, 1984) 1983-1984 Reg. Sess., p. 1.) The term "covered claims" has continued to be largely defined by what is expressly excluded in the Guarantee Act.

whether a particular claim falls within the statutory definition of covered claims. (*Saylin* v. *California Ins. Guarantee Assn.* (1986) 179 Cal.App.3d 256, 262 [224 Cal.Rptr. 493], internal quotation marks omitted.) That determination, of course, is subject to administrative interpretation and judicial review. (See *Middleton* v. *Imperial Ins. Co., supra*, 34 Cal.3d at p. 137 ["covered claims" is a term of art].) Research has not revealed any case considering the question of whether a claim may be a covered claim because of estoppel.[7]

CIGA argues that obligations "arising out of an insurance policy of the insolvent insurer" (Stats. 1984, ch. 564, § 1, p. 2203 [Ins. Code, former § 1063.1, subd. (c)(1)]) should be restricted to obligations arising out of *written* policies of insurance, because the term "policy" is generally defined in Insurance Code section 380 as "[t]he written instrument, in which a contract of insurance is set forth . . . ." If the obligations are so restricted, CIGA contends, the claim of Blue Jay and Jenkins, which is not based on a written policy, would not qualify as a covered claim payable by CIGA. We do not accept that argument.

CIGA's suggested interpretation is too restrictive because it minimizes the fact that "covered claims" are primarily defined as *obligations*, and obligations on the part of an insurer can arise from contracts created by conduct or oral agreements as well as writings. (*Granco Steel, Inc.* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 191, 197-205 [65 Cal.Rptr. 287, 436 P.2d 287].) That is what happened here. The WCJ and the Board properly applied the doctrine of equitable estoppel in the instant case, determining that Homeland became legally obligated to Blue Jay and Jenkins by the conduct of its agent, Pixley.

"Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. [Citations.]" (*Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245].) The elements of *Driscoll* were met by the conduct of Homeland's agent, Pixley.

---

[7]In a case involving completely different facts, an *insurance carrier* attempted to utilize an estoppel theory to avoid the clearly applicable subrogation exclusion and other insurance exclusions of the Guarantee Act. The theory was properly rejected. (*Central National Ins. Co.* v. *California Ins. Guarantee Assn.* (1985) 165 Cal.App.3d 453, 459-460 [211 Cal.Rptr. 435].)

In *Granco Steel, Inc.* v. *Workmen's Comp. App. Bd.*, *supra*, 68 Cal.2d at pages 203-205, the California Supreme Court quoted *Driscoll's* discussion of the elements of equitable estoppel and held that an insurance company was estopped to deny coverage since its agent had promised that coverage would be provided. *Granco Steel* characterized the question of whether an oral binder of insurance has been issued because of an insurance agent's representations as a mixed question of fact and law. (*Id.* at p. 197.) ■ In the instant case, CIGA does not dispute that Pixley was Homeland's agent. To the extent that factual determinations on this issue were made by the WCJ and the Board, we perceive no reason to disturb them, since they were based on substantial evidence. (*Lamb* v. *Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 274, 280-281 [113 Cal.Rptr. 162, 520 P.2d 978].) In light of *Granco Steel*, the legal determinations were equally sound. Moreover, since CIGA did not contend in its petition for reconsideration that substantial evidence does not support the finding that Homeland and CIGA are estopped to deny coverage, that contention has been waived. (Lab. Code, § 5904; *U.S. Auto Stores* v. *Workmen's Comp. App. Bd.* (1971) 4 Cal.3d 469, 476-477 [93 Cal.Rptr. 575, 482 P.2d 199].)

In view of the ambiguity surrounding the statutory definition of covered claims and the lack of any statutory exclusion of claims asserted under policies deemed to exist by reason of estoppel, we decline to hold that the claim of Blue Jay and Jenkins is excluded from the definition of covered claims. We hold that, although coverage of Blue Jay and Jenkins was created by estoppel, the claim of Blue Jay and Jenkins was a covered claim within the meaning of Insurance Code section 1063.1, subdivision (c)(1), and thus CIGA is obligated to pay workers' compensation benefits to Conces, the employee injured during employment by Blue Jay and Jenkins. This result is consistent with the legislative purpose of the Guarantee Act—to provide carefully limited protection to insured members of the public. The group intended to be protected by the Guarantee Act includes Blue Jay and Jenkins, who, in good faith, acted to meet their legal obligation to provide workers' compensation insurance to their employees.

### (2)   *The Obligation of CIGA Is Not Based on Tort Liability*

■ Noting that one of the exclusions in the Guarantee Act is for tort claims against insolvent insurers, CIGA argues that it is essentially being required to provide malpractice insurance to Homeland's agent, Pixley, because of his asserted negligence. This, CIGA asserts, results in CIGA's being asked to pay a claim for a tort of the insolvent insurer's agent although liability of the insolvent insurer for its own tortious conduct is excluded

from CIGA's liability pursuant to the Guarantee Act. That argument is unavailing.

On the date of injury, Insurance Code section 1063.2, subdivision (f) (now subd. (h)), provided: " *'Covered claims' shall not include any judgments against or obligations or liabilities of the insolvent insurer* or the commissioner, as liquidator, or otherwise *resulting from alleged or proven torts*, nor shall any default judgment or stipulated judgment against the insolvent insurer, or against the insured of the insolvent insurer, be binding against the association." (Stats. 1984, ch. 433, § 1, p. 1817, italics added.) Because of the tort exclusion, CIGA is immune from tort liability for violation of the Unfair Practices Act (Ins. Code, § 790 et seq.), intentional infliction of emotional distress, and common law bad faith arising from its handling of claims (*Isaacson* v. *California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 783-795 [244 Cal.Rptr. 655, 750 P.2d 297]) and for torts of insolvent insurers (*Interstate Fire & Casualty Ins. Co.* v. *California Ins. Guarantee Assn.* (1981) 125 Cal.App.3d 904, 909-910 [178 Cal.Rptr. 673]).

In *Carver* v. *Workers' Comp. Appeals Bd., supra,* 217 Cal.App.3d 1539, CIGA contended that it was immune from liability for a penalty under Labor Code section 5814 because of an insolvent insurer's delay in paying benefits to an injured employee. (*Carver, supra,* at p. 1546.) One ground on which CIGA based its assertion of immunity was the statutory exclusion of tort liability of insolvent insurers from the definition of covered claims. Distinguishing the workers' compensation situation from other decisional law, the *Carver* court pointed out that the right to workers' compensation benefits is wholly statutory and not derived from the common law of either torts or contracts. (*Carver, supra,* 217 Cal.App.3d at p. 1547.) The *Carver* court concluded: "We do not find the fixed percentage assessed by Labor Code section 5814 to be analogous to tort damages in the civil field. We conclude that it is more in the nature of a built-in statutory method of ensuring the timely return to work of injured workers by providing an economic incentive to employers to make the payments due for prompt necessary treatment under the Labor Code. CIGA, as a creature of statute, is bound to pay all covered claims in the absence of a statutory exclusion. No tort liability was imposed on the insolvent workers' compensation carrier in the instant case, since the Board does not adjudicate tort claims. The amount at issue herein is clearly a workers' compensation benefit, not tort damages, and is not excluded by section 1063.2, subdivision (h)." (217 Cal.App.3d at p. 1548, fn. omitted.)

Similarly, no tort liability has been imposed here. Even if tortious conduct by Pixley led to the Board's finding, CIGA's obligation is not based on tort damages, but rather on liability for coverage under a workers' compensation policy that Homeland, the insolvent insurer, was estopped to deny. There-

fore, we conclude that payment of this claim was not excluded by former Insurance Code section 1063.2, subdivision (f).

As recognized by the WCJ, the Insurance Code provisions defining covered claims and excluding tort liability must be construed in light of the constitutional declaration that it is the public policy of this state that there be adequate insurance coverage against liability for workers' compensation. (Cal. Const., art. XIV, § 4.)[8] In enacting the Guarantee Act, the Legislature indicated it was mindful of the importance of workers' compensation benefits by expressly excluding such benefits from the monetary limitations of coverage in Insurance Code section 1063.1, subdivisions (c)(5) and (c)(6).[9] We conclude that the legislative intent expressed in Insurance Code sections 1063.1 and 1063.2 is best served by extending the protection of CIGA to the small business and its owner, Blue Jay and Jenkins, who in good faith sought to provide coverage for the injured worker, Conces.

On appeal, CIGA has raised several additional contentions. However, because those issues were not raised in the petition for reconsideration, they were waived. (Lab. Code, § 5904; *U.S. Auto Stores* v. *Workmen's Comp. App. Bd.*, *supra*, 4 Cal.3d at pp. 476-477.)

### DISPOSITION

The August 15, 1991, order of respondent Workers' Compensation Appeals Board denying reconsideration is affirmed.

Gates, Acting P. J., and Fukuto, J., concurred.

Petitioner's application for review by the Supreme Court was denied February 11, 1993.

---

[8]California Constitution, article XIV, section 4, provides in pertinent part: "The Legislature is hereby expressly vested with plenary power . . . to create, and enforce a complete system of workers' compensation, by appropriate legislation . . . . A complete system of workers' compensation includes . . . full provision for adequate insurance coverage against liability to pay or furnish compensation . . . and full provision for vesting power, authority and jurisdiction in an administrative body with all the requisite governmental functions to determine any dispute or matter arising under such legislation, to the end that the administration of such legislation shall accomplish substantial justice in all cases expeditiously, inexpensively, and without incumbrance of any character; all of which matters are expressly declared to be the social public policy of this State . . . ."

[9]As previously noted, on the date of injury Insurance Code section 1063.1, subdivision (c)(5), excluded from the definition of covered claims those claims that were for amounts less than $100, the first $100 of any claim, and the portion of any claim that exceeded policy limits, but provided the exclusion did not apply to claims for workers' compensation benefits. Insurance Code section 1063.1, subdivision (c)(6), excluded from the definition of covered claims the portion of any claim exceeding $500,000 unless the claim was for workers' compensation benefits. Subdivision (c)(5) was amended since the date of injury to add claims for unearned premiums to the exception from exclusion. Subdivision (c)(6) has not been amended since the date of injury.