[No. B130555. Second Dist., Div. Four. Feb. 28, 2000.]

ALOHA PACIFIC, INC., et al., Plaintiffs and Appellants, v.
CALIFORNIA INSURANCE GUARANTEE ASSOCIATION, Defendant
and Respondent.

## COUNSEL

Pircher, Nichols & Meeks and James L. Goldman for Plaintiffs and Appellants.

Black, Compean & Hall, Frederick G. Hall and Daniel Eli for Defendant and Respondent.

## OPINION

**DAU, J.**\*—In this case we consider whether California Insurance Guarantee Association (CIGA) is barred from contesting whether a claim is "within the coverage of an insurance policy of [an] insolvent insurer," as used in Insurance Code section 1063.1, subdivision (c)(1), where a third party claimant has obtained a judgment declaring that the insurer (now insolvent) had no basis to deny coverage for the claim. Interpreting the statute so as to leave no part of it useless or deprived of meaning, we hold that the statute permits CIGA to contest whether the claim is within policy coverage, and CIGA is not bound by the prior judgment against the insolvent insurer. We then interpret the policy in question, which covers "injury arising out of . . . piracy, unfair competition, or infringment [*sic*] of copyright, title or slogan," but which does not apply to "injury arising out of . . . infringement of trademark, service mark or trade name, other than titles or slogans . . . ." We conclude that this policy language does not cover the claims at issue in this case, which are for trademark infringement and false designation of origin brought under the Lanham Act (15 U.S.C. §§ 1114(1)(a), 1125(a)), and for unfair competition under section 17200 of the Business and Professions Code.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant Rusty's Island Chip Co. (Rusty's) is a partnership comprised of Rusty Vasterling II and Carol Mersch. The partnership owns the federally registered trademark "Rusty's Island Chips," the trademark "Island Chips," and the trade dress associated with those marks (together, the marks). Before 1989 Rusty's used the marks in connection with the manufacture, marketing, distribution and sale of "Maui style" potato chips. In October 1989 Rusty's licensed the marks to appellant Aloha Pacific, Inc. (Aloha), which began marketing chips in packaging using the marks in various parts of the United

---

\*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

States, including Southern California. In November 1989 appellants sued Island Industries, Inc. (Island) for trademark infringement in federal district court, in an action entitled *Rusty's Island Chip Co. v. Island Industries, Inc.* (U.S. Dist. Ct. (C.D.Cal.) 1989, Civ. No. 89 6679 JMI) (the federal action), seeking preliminary and permanent injunctions.

Island was insured by Canadian Insurance Company of California (Canadian), which initially declined to defend Island in the federal action on the ground that no money damages were sought.

In February 1990 the federal court enjoined Island from using the marks pending the outcome of the case. Appellants amended their complaint in April 1990 to add Island's principals, Jay Feinberg and Gary Quick (collectively, Feinberg), as defendants and to include a claim for money damages and a cause of action for unfair competition. As amended, appellants' complaint alleged Rusty's ownership of the federally registered trademark "Rusty's Island Chips" and the trademark "Island Chips" and the trade dress associated with the marks, that defendants used the marks "with knowledge . . . of Rusty's right, title, and interest" in the marks, and that the use "ha[d] caused confusion, mistake and deception in violation of" section 1114 of title 15 United States Code.[1] The complaint also alleged causes of action for false designation of origin under section 1125(a) of title 15 United States Code[2] and for unfair competition under section 17200 of the California Business and Professions Code.[3]

---

[1]Section 1114(1)(a) provides: "Any person who shall, without the consent of the registrant . . . [¶] . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . [¶] . . . [¶] shall be liable in a civil action by the registrant for the remedies hereinafter provided. . . ." (15 U.S.C. § 1114(1)(a).)

[2]Section 1125(a) provides: "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which— [¶] (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . [¶] . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." (15 U.S.C. § 1125(a).)

[3]Section 17200 defines "unfair competition" to mean "unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising . . . ." (Bus. & Prof. Code, § 17200.) Section 17203 of the Business and Professions Code provides that "[a]ny person [performing an act of] unfair competition [within this state] may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which

After appellants amended their complaint, Canadian accepted Island's tender of the defense, subject to a reservation of specified rights, including that coverage would not be afforded for punitive or trebled damages "where the enhancement is for purposes of punishment." Canadian did not expressly reserve any rights based on Island's willful misconduct or the policy's exclusion for injury arising out of trademark infringement.[4]

Island became insolvent, declared bankruptcy, and was liquidated in 1990. Appellants agreed with the trustee in bankruptcy that they would look solely to the Canadian policy to satisfy any judgment, and they dismissed their claim against Feinberg. In return, the trustee allowed appellants to pursue their federal action.

Appellants obtained a federal court judgment in August 1992, entitling them to recover, on the federal claims, their actual damages according to proof, prejudgment interest, treble damages, reasonable attorney fees, and costs, and on their unfair competition claim, Island's profits as restitution according to proof, prejudgment interest, and costs.

In connection with this judgment, the federal court made findings of fact, which are summarized here. In May 1989 Rusty's suspended operations due to financial problems but did not abandon the marks. Around that time Feinberg made an offer to purchase Rusty's, which was rejected. Feinberg formed Island and attempted unsuccessfully to make Vasterling a part owner and to get Rusty's to assign the marks to Island. As a result of the inability to purchase Rusty's or get the assignment, Feinberg implemented a scheme to misappropriate the goodwill associated with the marks and transfer it to his own designations through a series of gradual changes in the marks. Island began using the marks on potato chips in June 1989, principally in California, and this use was willful and with actual knowledge on the part of Island's owners of Rusty's right, title and interest in the marks. Appellants

---

constitutes unfair competition . . . or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." (Bus. & Prof. Code, § 17203.)

[4]The policy issued to Island contains a broad form comprehensive general liability endorsement, in which Canadian promises to pay "all sums which the insured shall become legally obligated to pay as damages because of . . . advertising injury to which this insurance applies . . . ." The policy defines "advertising injury" as "injury arising out of an offense committed during the policy period occurring in the course of the named insured's advertising activities, if such injury arises out of . . . piracy, unfair competition, or infringement of copyright, title or slogan." Immediately following the insuring agreement, the policy states: "This insurance does not apply . . . to advertising injury arising out of . . . infringement of trademark, service mark or trade name, other than titles or slogans, by use thereof on or in connection with goods, products or services sold, offered for sale or advertised . . . ."

sent letters asking Island to stop using the marks. From June 1989 until a preliminary injunction was issued in February 1990 Island used designations and trade dress which were identical or essentially identical to, and confusingly similar with, the marks. Island used the marks with the intent to misappropriate the goodwill associated with them, caused confusion, mistake, and deception, and caused appellants to suffer actual damages.

The federal court recommended that the parties obtain a coverage determination before expending resources on proving damages.

Canadian filed an action in the California superior court in November 1992 seeking a declaration that it "ha[d] no obligation under [its] policy . . . to pay any judgment that [appellants] might receive in the [federal] action," and appellants cross-complained for the obverse declaration. In *Canadian Ins. Co. v. Rusty's Island Chip Co.* (1995) 36 Cal.App.4th 491 [42 Cal.Rptr.2d 505] (*Canadian v. Rusty's*), Division One of this district held that Canadian "ha[d] no present basis for denying coverage" and that its "failure to reserve its right to contest coverage under the policy's exclusions of coverage for willful acts or trademark infringement waived its right to assert those exclusions as a basis for denying coverage in the federal action." (*Id.* at p. 498.) The Court of Appeal explained its use of the phrase "present basis" as follows: "[T]he damage phase of the federal action has been deferred until this coverage dispute is concluded. If the final judgment rendered in the federal action includes punitive damages or treble damages within the meaning of the reservation of rights timely asserted by Canadian, those coverage issues (if disputed) will have to be determined at a later time. . . ." (*Id.* at pp. 498-499, fn. 10.) Division One remanded the matter to the trial court with directions to enter a judgment in favor of Rusty's and Aloha and against Canadian. (*Id.* at p. 499.) A minute order in the superior court file, dated September 19, 1995, reads: "The judgment in this matter, entered April 28, 1994, is hereby set aside and vacated, and a new judgment is entered this day in favor of defendant Rusty's Island Chip Company and against Plaintiff Canadian Insurance Company."

Following that ruling, Canadian became insolvent. The Insurance Commissioner of the State of California (the Commissioner) became Canadian's liquidator in August 1995. Appellants filed a proof of loss claim with the Commissioner in September 1996.

On dates not reflected in the record, appellants moved the federal district court to award damages against Island. In August 1997 the federal court ruled that appellants were entitled to "compensatory damages resulting from

the trademark infringement," as follows: appellants were entitled to recover $40,000 that had been expended to redesign Aloha's packaging, trebled to $120,000; appellants had failed to meet their burden to show Aloha had lost profits and Island had profited from sales of infringing products; and, inasmuch as the court had determined that Island's conduct was "intentional, willful, conscious and unfair," appellants were entitled to attorney fees according to proof. In November 1997 the district court filed its judgment awarding damages (including attorney and expert witness fees, expenses, and prejudgment interest) of approximately $450,000 to appellants and against Island.

In February 1998 CIGA denied appellants' claim, and appellants filed this action. Their complaint alleges the litigation history, Island's liquidation, Canadian's insolvency, that the Canadian policy includes coverage for appellants' claim against Island for trademarks involving a title and obligated Canadian to indemnify Island for such claims, and that, after the federal judgment became final, CIGA denied the claim. Appellants' complaint seeks a declaration of their rights and a declaration that Island did not engage in " 'willful' misconduct within the meaning of those terms under Section 522 [*sic*] of the California Insurance Code . . . ." Appellants moved for summary judgment, and the trial court denied the motion, holding that, although there were no triable issues of fact, it was demonstrated in the federal action that Island engaged in willful acts, not covered under Insurance Code section 533,[5] and that the claim at issue did not fall within the covered claims that CIGA was required to pay under section 1063.1, subdivision (c)(1). The parties stipulated that the trial court could enter judgment for CIGA, and appellants appeal from that judgment.[6]

## II.   CONTENTIONS OF THE PARTIES

Appellants contend that CIGA cannot rely on section 533 because Canadian was adjudged to have waived its right to assert the "wilful act" defense, and CIGA is bound by that judgment. Appellants also contend principles of waiver and estoppel apply to CIGA because it defended the federal action following Canadian's insolvency without issuing a reservation of rights

---

[5]Insurance Code section 533 provides: "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others."

All further statutory references are to the Insurance Code unless otherwise indicated.

[6]Where it appears, as it does here, that the parties intended that their consent to a judgment was given only pro forma to facilitate an appeal, the rule that a party may not appeal a consent judgment does not apply. (See *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 401 [87 Cal.Rptr.2d 453, 981 P.2d 79].)

letter and delayed its denial of appellants' claim. Respondent's principal contention is based on the statutory definition of "covered claims" that CIGA is required to pay. The definition requires, in part, that an obligation be within the coverage of the insolvent insurer's policy, and respondent contends that, because the insurer was held to have waived a defense, the definition is not met in this case.

Appellants also contend the judgment they obtained in the federal action is covered by Canadian's promise to pay all sums which the insured shall become legally obligated to pay as damages because of "injury arising out of . . . piracy [or] unfair competition," notwithstanding that the policy expressly "does not apply" to "injury arising out of . . . infringement of trademark, service mark or trade name, other than titles or slogans . . . ." Respondent contends the injury producing the judgment "aris[es] out of . . . infringement of trademark" and is, accordingly, not covered.

## III. DISCUSSION

### A. *Standard of Review*

"Summary judgment is properly granted when the evidence in support of the moving party establishes that there is no material issue of fact to be tried. (Code Civ. Proc., § 437c . . . .) The trial court must decide if a triable issue of fact exists. If none does, and the sole remaining issue is one of law, it is the duty of the trial court to determine the issue of law. (*State Farm Fire & Casualty Co. v. Eddy* (1990) 218 Cal.App.3d 958, 964 [267 Cal.Rptr. 379].) . . . [¶] Appellate review of summary judgment is limited to the facts contained in the documents presented to the trial court. This court exercises its independent judgment as to the legal effect of the undisputed facts disclosed by the parties' papers. (*State Farm Fire & Casualty Co. v. Eddy, supra,* 218 Cal.App.3d at p. 965; *Downey Savings & Loan Assn. v. Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072, 1086-1087 [237 Cal.Rptr. 835].)" (*B & E Convalescent Center v. State Compensation Ins. Fund* (1992) 8 Cal.App.4th 78, 88-89 [9 Cal.Rptr.2d 894], citations omitted.)

### B. *Statutory Interpretation*

The conditions under which CIGA is required to conduct its affairs are governed by statute (see §§ 1063-1063.16), commonly known as the Guarantee Act. CIGA was established pursuant to legislation adopted in 1969. (See Stats. 1969, ch. 1347, § 3, p. 2699.) This legislation required insurers

admitted to transact insurance in California in certain classes, including liability insurers, to establish CIGA and, as a condition to each insurer's authority to transact insurance in this state, to participate in that association. (§ 1063, subd. (a).) CIGA was thus created "to provide for each member insurer insolvency insurance" (*ibid.*), which is defined as "insurance against loss arising from the failure of an insolvent insurer to discharge its obligations under its insurance policies." (§ 119.5.)

CIGA is required by section 1063.2, subdivision (a) to "pay and discharge *covered claims* . . . ." (Italics added.) "Covered claims" means "the obligations of an insolvent insurer . . . imposed by law and within the coverage of an insurance policy of the insolvent insurer . . . ." (§ 1063.1, subd. (c)(1).)[7]

■ Here, as noted, a prior litigation between appellants and Canadian resulted in a judgment, which establishes that Canadian is liable to appellants in connection with their trademark infringement claim against Canadian's insured, with the amount of damages owed by Canadian to be determined at a later time.

Whether the Guarantee Act permits CIGA to relitigate whether Canadian's policy "covers" appellants' claim is the central issue of this appeal. Resolution of this issue turns on statutory construction, the principles of which are well established. ■ "The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. . . ." (*Select Base Materials v. Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672], citations omitted.) "[I]t is well settled 'that in attempting to ascertain the legislative intention effect should be given, whenever possible, to the statute as a whole and to every word and clause thereof, leaving no part of the provision useless or deprived of meaning.'" (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 18 [270 Cal.Rptr. 796, 793 P.2d 2].)

■ There are two parts to the definition of covered claims. For an obligation of the insolvent insurer to fall within the "covered claims" that CIGA must pay, the obligation must be (1) "imposed by law" and (2)

---

[7]Section 1063.1, subdivision (c)(1) defines "covered claims," in pertinent part, as follows: "[T]he obligations of an insolvent insurer . . . (i) imposed by law and within the coverage of an insurance policy of the insolvent insurer; (ii) which were unpaid by the insolvent insurer; (iii) which are presented as a claim to the liquidator in this state or to the association on or before the last date fixed for the filing of claims . . . ; (iv) which were incurred prior to the date coverage under the policy terminated . . . ." Additional matters included within "covered claims" are specified in section 1063.1, subdivision (c)(2).

"within the coverage of an insurance policy of the insolvent insurer." (§ 1063.1, subd. (c)(1).)

Although no reported case addresses the issue, we need not dwell long on whether the judgment in *Canadian v. Rusty's* is an obligation of an insolvent insurer imposed by law. "A judgment is the final determination of the rights of the parties in an action or proceeding" (Code Civ. Proc., § 577), and the phrase "imposed by law" squarely denominates a judgment. That the Legislature intended that a judgment against the insolvent insurer would be among the obligations "imposed by law" is shown by the statute's exclusion of certain matters from the ambit of covered claims. Subdivision (g) of section 1063.2 provides: " 'Covered claims' shall not include any judgments against or obligations or liabilities of the insolvent insurer . . . resulting from alleged or proven torts, nor shall any default judgment or stipulated judgment against the insolvent insurer, or against the insured of the insolvent insurer, be binding against the association."[8] "The clear purpose of [this] statutory language," said the court in *Biggs v. California Ins. Guarantee Assn.* (1981) 126 Cal.App.3d 641, 645 [179 Cal.Rptr. 16] (*Biggs*), "is to protect CIGA against collusion and to require simply that the validity of any claim be determined in an adversary setting before being reduced to a judgment which CIGA must honor."[9]

It appears that, by excluding from the primary definition of covered claims a default or stipulated judgment against the insolvent insurer, the Legislature necessarily determined that a judgment obtained in an adversary setting would constitute an obligation imposed by law, and we so hold.

Respondent's contention that the judgment in *Canadian v. Rusty's* does not meet the definition of "covered claim" focuses on the second portion of the definition—"the obligation[] of an insolvent insurer . . . within the coverage of an insurance policy of the insolvent insurer." (§ 1063.1, subd. (c)(1).) Our research has disclosed no case considering whether the phrase "within the coverage of an insurance policy" allows CIGA to relitigate an issue that the insolvent insurer lost.

---

[8]The Legislature added the exclusion for judgments against an insolvent insurer resulting from alleged or proven torts in 1970 and, the language concerning default judgments and stipulated judgments, respectively, in 1971 and 1984. (See Stats. 1970, ch. 1205, § 4, p. 2122; Stats. 1971, ch. 436, § 2, p. 848; Stats. 1984, ch. 433, § 1, p. 1816.)

Additional matters that are *not* included within "covered claims" are specified in section 1063.1, subdivision (c), paragraphs (2)-(12) and section 1063.2, subdivision (h).

[9]*Biggs*, *supra*, 126 Cal.App.3d 641, involved a default judgment against the policyholder of an insolvent insurer.

Very little light is shed on the meaning of section 1063.1, subdivision (c)(1) by history. The Legislature amended the "covered claims" definition in 1987 by striking "arising out" and inserting "within the coverage" before "of an insurance policy of an insolvent insurer." (Stats. 1987, ch. 833, § 1, p. 2661.) This revision first appears in Assembly Bill No. 1771 as amended in the Senate June 30, 1987. None of the legislative history materials provided to us by the Legislative Intent Service disclose the reason for this change, and no court has addressed the reason for, or effect of, this particular amendment.[10]

The court in *Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775 [244 Cal.Rptr. 655, 750 P.2d 297] (*Issacson*) noted the 1987 amendments to sections 1063.1 and 1063.2, which were inapplicable in that case due to their effective date. Because of this, the court said it would not discuss the amendments, "other than to note that they further restrict the definition of what constitutes a 'covered claim[.]' " (44 Cal.3d at p. 780, fn. 1.)[11]

The 1987 amendment to section 1063.1, subdivision (c)(1) does appear to restrict somewhat the definition of covered claims. In other words, the phrase "within the coverage of an insurance policy" appears to confine the obligation in question to policy terms and conditions more so than does "arising out of an insurance policy."

The Insurance Code does not define "coverage," but it defines "insurance" as "a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event" (§ 22) and, "policy" as "[t]he written instrument, in which a contract of insurance is set forth . . ." (§ 380), and it provides that "[a] policy shall specify: . . . [¶] . . . [¶] (d) The risks insured against. [¶] (e) The period during which the insurance is to continue . . ." (§ 381). The meaning of "coverage" intended by the Legislature may be drawn from the definitions referred to above, from the context in which the word is used in subdivision (c)(1) of section 1063.1, and from other usage of the word in the Guarantee Act. The usage that most nearly parallels the phrase at issue in this case is found in subdivision (c)(9) of section 1063.1, which provides: " 'Covered claims' does not include (i)

[10]This is the only revision in the portion of the definition quoted above since the original enactment of section 1063.1 in 1969. (See Stats. 1969, ch. 1347, § 3, p. 2700.)

[11]In *R. J. Reynolds Co. v. California Ins. Guarantee Assn.* (1991) 235 Cal.App.3d 595, 600, footnote 3 [1 Cal.Rptr.2d 405], the court noted the 1987 amendment to section 1063.1, subdivision (c)(1) but did not address the effect of the revision.

any claim to the extent it is *covered* by any other insurance . . . ."[12] (Italics added.) "Coverage" and "covered," as used in subdivision (c)(1) and (9) appear to refer to the protection from risk that is afforded by insurance.

Based on these definitions and uses of "coverage" in the referenced statutes, we conclude that the Legislature intended the phrase "within the coverage of an insurance policy" in section 1063.1, subdivision (c)(1) to mean within the risks of loss protected against by an insurance policy. Thus, the reading of the pertinent portion of subdivision (c)(1) would be: the obligations of an insolvent insurer within the risks of loss protected against by an insurance policy of the insolvent insurer.[13] We believe this reading is faithful to the legislative intent.

That the "risks protected against by an insurance policy" is commonly indicated by "coverage" may also be seen by reference to insurance treatises. Thus, "[t]he significance of the *coverage* of a risk by a policy lies in the fact that in accord with the contractual intent of the parties, the insured cannot recover on a policy unless the loss is occasioned by one of the perils *covered* by the policy. That is, recovery can be had only when the loss is brought fairly within the terms of the contract or is, by reasonable intendment, *covered* by it, in other words, the risk run must also correspond with that understood and intended to be run at the time the contract was effected, in order to subject the insurers to liability for the loss." (9 Couch on Insurance 2d (rev. ed. 1985) § 39:3, pp. 496-497, fns. omitted, italics added.)

The same meaning—the risk protected against by an insurance policy— may be inferred from the use of the word "coverage" by the courts. Thus, from *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1258 [10 Cal.Rptr.2d 538, 833 P.2d 545]: "Comprehensive general liability (CGL) insurance policies generally include *coverage* for 'advertising injury.' This *coverage*, as ordinarily written, applies to 'damages' the insured must pay for injury arising out of 'unfair competition' occurring in the course of the

---

[12]Subdivision (c)(9) was a part of section 1063.1 (as subd. (c)(7)) as originally enacted in 1969. (See Stats. 1969, ch. 1347, § 3, p. 2701.)

The Guarantee Act also uses the word "coverage" in slightly different contexts. For example, section 1063.2, subdivision (c), refers in paragraph (1) to "uninsured motorists *coverage*" and in paragraph (2) to "collision *coverage*." (Italics added.) Subdivision (c) of section 1063.2, as originally enacted contained the provisions relating to "uninsured motorist coverage." (Stats. 1969, ch. 1347, § 3, p. 2702.) Paragraph (2), relating to "collision coverage," was added in 1970. (Stats. 1970, ch. 1205, § 4, p. 2122.) These two uses refer to types of protection afforded by a policy of automobile insurance. In common usage, "coverage" can denote "[t]he extent of protection afforded by an insurance policy." (Am. Heritage College Dict. (3d ed. 1993) p. 320, col. 1.)

[13]In the discussion that follows, we use "risks" as shorthand for "risks of loss."

insured's 'advertising activities.' We granted review to consider questions regarding the scope of *coverage* afforded by this standard policy language." (Italics added.) And, from *Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1116 [90 Cal.Rptr.2d 647, 988 P.2d 568]: "[T]he only applicable clause provides *coverage* for 'advertising liability' resulting from infringement 'of title or of slogan' (*coverage* clause). Construing this language in light of the rules governing contractual interpretation reveals that the *coverage* clause—when read in conjunction with the clause excluding *coverage* for trademark infringement (trademark exclusion clause)—does not cover the . . . judgment [in the underlying case] . . . ." (Italics added.) See also *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645 [42 Cal.Rptr.2d 324, 913 P.2d 878]: "The difference in the nature of the risks insured against under first party property policies and third party liability policies is also reflected in the differing causation analyses that must be undertaken to determine *coverage* under each type of policy. . . . ' "Property insurance . . . is an agreement, a contract, in which the insurer agrees to indemnify the insured in the event that the insured property suffers a covered loss. *Coverage*, in turn, is commonly provided by reference to causation, e.g., 'loss caused by . . .' certain enumerated perils. . . ." ' . . . '[T]he right to *coverage* in the third party liability insurance context draws on traditional tort concepts of fault, proximate cause and duty. This liability analysis differs substantially from the *coverage* analysis in the property insurance context, which draws on the relationship between perils that are either *covered* or excluded in the contract. In liability insurance, by insuring for personal liability, and agreeing to *cover* the insured for his own negligence, the insurer agrees *to cover* the insured for a broader spectrum of risks.' " (*Id.* at pp. 663-664, citations omitted, italics added and omitted.)

There can be aspects of "coverage" other than those we have discussed above, to be sure. For example, the word is commonly used to refer to the period during which a policy is in force, as in coverage period. And it is also used in relation to the monetary limitation of an insurer's liability, as in coverage limits. Nevertheless, because of the context in which the phrase "within the coverage of an insurance policy" is used in section 1063.1, subdivision (c)(1), we believe the Legislature intended the phrase to mean within the risks protected against by an insurance policy.

Accordingly, for the obligation of Canadian, the insolvent insurer, to be a covered claim under the Guarantee Act, the obligation must be (1) imposed by law and (2) within the risk of loss protected against by the Canadian policy. The judgment obtained by appellants in *Canadian v. Rusty's* meets the first requirement, but it does not meet the second. The court in *Canadian v. Rusty's* did not reach the issue whether Canadian's policy covered appellants' claim. Rather, it held that Canadian had waived the right to contest the

policy's exclusions of coverage for willful acts and trademark infringement by not asserting them in its reservation of rights letter. There may be situations in which a prior judgment would have determined whether a claim was within the risks of loss protected against by the insolvent insurer's policy, but this is not one of them. Were we to hold in this case that the prior judgment precluded CIGA from contesting whether the claim was "within the coverage" of Canadian's policy, we would leave the second requirement of section 1063.1, subdivision (c)(1) useless or deprived of meaning. Therefore, we conclude that the Legislature must have intended, in circumstances such as those presented by this case, that CIGA would be able to contest whether a claim is within the coverage of (or within the risks protected against by) the insolvent insurer's policy.[14]

### C. *Appellants' Waiver and Estoppel Contentions*

Appellants contend CIGA waived the right to assert, or is equitably estopped to assert, that appellants' claim was not within the coverage of the Canadian policy by (a) defending the federal action following Canadian's insolvency without issuing a reservation of rights letter or (b) delaying its denial of appellants' claim.

Appellants have made no showing that CIGA intentionally relinquished a known right after knowledge of the facts (see *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31 [44 Cal.Rptr.2d 370, 900 P.2d 619]), and their waiver argument is, accordingly, not well taken.

Appellants' reservation of rights letter contention is also without merit. A liability insurer may become estopped from setting up a ground of noncoverage by defending its insured without disclaiming liability and giving notice of its reservation of rights. (See, e.g., *Miller v. Elite Ins. Co.* (1980) 100 Cal.App.3d 739, 755 [161 Cal.Rptr. 322].) One rationale for this exception to the general rule that estoppel cannot be used to create coverage is that "[t]he insurer's undertaking defense of the third party suit creates a high potential for *misleading* the insured, by creating the impression the insurer is not disputing coverage. And, the insured may rely thereon by failing to

---

[14]We note that the Supreme Court in *Isaacson, supra,* 44 Cal.3d 775, construing the pre-1988 statutory language (§§ 1063.1, subd. (c)(1), 1063.2, subd. (a)), recognized that "the scope of [CIGA's] obligation to pay and defend claims is defined in terms of the underlying insurance policy provisions." (44 Cal.3d at p. 791.) The court "therefore refer[red] to the contractual duties of an insurer, in defining the scope of CIGA's statutory duties." (*Ibid.*) (In *Issacson* the court considered CIGA's duty to provide coverage and a defense.) The quoted passage of the court's opinion quite closely tracks the construction we give to subdivision (c)(1) of section 1063.1 as amended in 1987.

retain independent counsel to negotiate or defend the action. [Citations.]" (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1999) ¶ 7:712, p. 7B-59 (rev. #1, 1999), italics in original.) In this case, however, the insured (Island) was liquidated in 1990 and freed from any liability to appellants by the latters' agreement to look solely to the Canadian policy to satisfy any judgment they might obtain. By the time CIGA picked up Canadian's defense obligation after that insurer's insolvency, the insured was no longer at risk and could not have been misled by the absence of a letter from CIGA reserving rights.

For their estoppel contention, appellants rely on *California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.* (1992) 10 Cal.App.4th 988 [12 Cal.Rptr.2d 848] (*CIGA v. WCAB*).[15] The estoppel found in that case arose from the nonissuance of a workers' compensation policy to an insured that had been repeatedly assured by the insolvent insurer's agent that a policy had issued, and the court's holding was based in part on the Guarantee Act's definition of covered claims: " 'the obligations of an insolvent insurer . . . (i) imposed by law and arising out of an insurance policy of the insolvent insurer . . . [and] (vi) in the case of a policy of workers' compensation insurance, to provide workers' compensation benefits under the Workers' Compensation Law of this state . . . .' " (*CIGA v. WCAB* at p. 995, quoting § 1063.1, subd. (c)(1)(i), (vi), italics omitted.)[16] The special workers' compensation insurance provisions of section 1063.1, subdivision (c)(1)(vi) were critical to the *CIGA v. WCAB* court's analysis those provisions of the act are inapplicable to this claim; and appellants' reliance on that case is misplaced: the case does not hold that *every* estoppel affixed to an insolvent insurer will also be imposed upon CIGA. Moreover, appellants did not obtain, in their action against Canadian, a ruling that the insurer was estopped to deny coverage. (See *Canadian v. Rusty's, supra,* 36 Cal.App.4th at p. 496 [ruling based on waiver].)

We are likewise unpersuaded by appellants' estoppel contention based on the claimed delay by CIGA in denying the claim. Appellants made no showing in the court below that they relied to their detriment on anything

---

[15]To invoke equitable estoppel an insured must plead and prove: " '(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' " (*CIGA v. WCAB, supra,* 10 Cal.App.4th at p. 997, quoting *Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245].)

[16]The court in *CIGA v. WCAB* construed the form of section 1063.1, subdivision (c)(1)(i) in effect before the 1987 amendment. (See text at fn. 10, *ante.*)

done or not done by CIGA. At oral argument, when asked what appellants would have done differently had they known CIGA would ultimately deny their claim, counsel for appellants asserted that he would have gone back to the judge who presided over the federal action and sought revisions in that court's findings of fact in an effort to bring appellants' claim within coverage. The 1992 judgment obtained in the federal action, entitling appellants to damages on their Lanham Act claims and their California unfair competition claim, was based on evidence introduced by appellants before Canadian became insolvent. Appellants argued the effect of that evidence and sought the findings that were made by the federal court, and they have demonstrated no legal basis for estoppel insofar as CIGA is concerned.

### D.  *Coverage*

■   The scope of a policy's protection is defined by the insuring agreement and the exclusions. (E.g., *Palmer v. Truck Ins. Exchange, supra,* 21 Cal.4th at pp. 1112, 1116-1117.) Accordingly, we next review those provisions of the Canadian policy.

■   Canadian in its policy promised to pay "all sums which the insured shall become legally obligated to pay as damages because of . . . advertising injury," which the policy defined as "injury arising out of . . . piracy, unfair competition, or infringment [*sic*] of copyright, title or slogan." The policy states that it "does not apply . . . to advertising injury arising out of . . . infringement of trademark, service mark or trade name, other than titles or slogans, by use thereof on or in connection with goods, products or services sold, offered for sale or advertised . . . ." In the context of appellants' claim against the insured, the issue presented is whether the claims that produced the federal judgment were insured against by Canadian's policy.

Following the completion of briefing and oral argument in this case, the Supreme Court decided *Palmer v. Truck Ins. Exchange, supra,* 21 Cal.4th 1109 *(Palmer)*. We requested briefing by the parties on the effect of this decision. *Palmer* involves the same causes of action as those asserted by appellants in the underlying federal action—infringement of a registered trademark and false designation of origin and false representation brought under the Lanham Act (15 U.S.C. §§ 1114(1)(a), 1125(a)) and unfair competition under California Business and Professions Code section 17200. In *Palmer* those claims had ripened into a judgment, which the insurer refused to pay.

■   The court in *Palmer* applied the following rules of policy construction, which we shall also apply here: " '[I]nterpretation of an insurance

policy is a question of law.' . . . 'While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' . . . Thus, 'the mutual intention of the parties at the time the contract is formed governs interpretation.' . . . If possible, we infer this intent solely from the written provisions of the insurance policy. . . . If the policy language 'is clear and explicit, it governs.' . . . [¶] When interpreting a policy provision, we must give its terms their ' "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage." ' . . . We must also interpret these terms 'in context' . . . and give effect 'to every part' of the policy with 'each clause helping to interpret the other.' " (21 Cal.4th at p. 1115, citations omitted.) In addition, the language in the "contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].

The policy at issue in *Palmer* provided coverage for " '[a]dvertising [l]iability,' " which it defined as " 'infringement . . . of title or of slogan,' " and excluded coverage " 'with respect to advertising activities' " for " 'infringement of registered trade mark . . . .' " The exclusion did " 'not relate to titles or slogans.' " (*Palmer, supra,* 21 Cal.4th at p. 1114 & fn. 3.) The *Palmer* court held that "[i]f a claim does not fall within the terms of [the policy's coverage] clauses, then no coverage exists. . . ." (*Id.* at pp. 1115-1116, citation omitted.) The court noted that "title" appears in both the coverage clause defining advertising liability and the trademark exclusion clause, and that nothing in the policy suggested that the two clauses defined "title" differently. (*Id.* at p. 1116.) Reading the policy's coverage clauses in conjunction with the clause excluding coverage for trademark infringement, the court held that these provisions cover infringement of names of literary or artistic works or names that are slogans, and no other names. (*Id.* at p. 1112.) The court reasoned as follows: "Examining the word 'title' in the context of the trademark exclusion clause establishes that 'title' can only mean the name of a literary or artistic work. The exclusion clause states: 'This insurance does not apply . . . with respect to advertising activities, to claim made against the insured for . . . infringement of registered trade mark, service mark or trade name by use thereof as the registered trade mark, service mark or trade name of goods or services sold, offered for sale or advertised, but this shall not relate to titles or slogans . . . .' Interpreted in its ordinary and popular sense, this clause excludes coverage for infringement of a 'registered trade mark, service mark or trade name' *unless* that 'trade mark, service mark or trade name' is a title or slogan. To be consistent with this interpretation, the definition of 'title' cannot subsume the definitions of 'trade mark,' 'service mark,' or 'trade name' as understood in the

Policy. Otherwise, all or part of the exclusion clause becomes meaningless. [¶] Only one definition fits: the name of a literary or artistic work. Because these names can be trademarked, adopting this definition of 'title' carves out a limited exception and gives effect to every part of the Policy's trademark exclusion clause. . . ." (*Id.* at pp. 1116-1117, fn. and citations omitted, italics in original.)

The trademark exclusion clause construed in *Palmer* differs slightly from the clause at issue here: the clause in *Palmer* refers to "infringement of *registered* trade mark" (*Palmer, supra,* 21 Cal.4th at p. 1114, italics added), whereas the clause in this case relates to "infringement of trademark," thus encompassing both varieties—registered and unregistered.

█ Applying the holding of *Palmer* to this case, we conclude that the claims based upon infringement of the registered trademark and upon false designation of origin resulting from infringement of the unregistered trademark are not within the grant of coverage of the Canadian policy for "injury arising out of . . . infringement of . . . title or slogan." The marks found to have been infringed—"Rusty's Island Chips" and "Island Chips"—are not the name of a literary or artistic work. Neither can the use of the marks be said to constitute infringement of a slogan. According to *Palmer,* "[a] slogan is 'a brief attention-getting *phrase* used in advertising or promotion' . . . or '[a] *phrase* used repeatedly, as in promotion' . . . ." (*Palmer, supra,* 21 Cal.4th at p. 1120, citations omitted, italics in original.) Appellants are not shown to have complained in the federal action of Island's use of slogans, and the federal court found Island infringed marks and trade dress, not slogans. Thus, the injury did not "aris[e] out of . . . infringement of title [of literary or artistic works] or slogan" (the coverage clause); rather, the claims are within the trademark exclusion, because the injury "ar[ose] out of . . . infringement of trademark . . . other than titles [of literary or artistic works] or slogans."

Appellants contend, however, that they also recovered in the federal action for unfair competition in relation to their trade dress and that this claim is covered by the portion of the Canadian policy defining "advertising injury" as "injury arising out of . . . unfair competition." The policy term "unfair competition" refers to "a civil wrong that can support an award of damages." (*Bank of the West v. Superior Court, supra,* 2 Cal.4th at p. 1265.) Appellants also assert that nothing in the court's opinion in *Palmer* suggests that the trademark infringement exclusion there at issue was intended to exclude coverage for trade dress infringement. Appellants are correct that the *Palmer* court did not consider whether trade dress infringement is within the coverage of a policy that defines advertising injury as "injury arising out

of . . . unfair competition," and our research has disclosed no case deciding this issue.

For their unfair competition-trade dress contention, appellants rely upon *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group* (1996) 50 Cal.App.4th 548, 564 [59 Cal.Rptr.2d 36] (*Lebas*), a case involving policy language very different from that construed in *Palmer* (and that at issue here),[17] and they point to that court's observation that "[t]rademark infringement is an act of unfair competition . . . ; it amounts to the wrongful taking of another's identifying mark. In other words, trademark infringement involves a very specific kind of unfair competition." (*Id.* at p. 564, citation and fn. omitted.) *Bank of the West v. Superior Court, supra,* 2 Cal.4th at page 1263 contains the following commentary: "The common law tort of unfair competition is generally thought to be synonymous with the act of 'passing off' one's goods as those of another. The tort developed as an equitable remedy against the wrongful exploitation of trade names and common law trademarks that were not otherwise entitled to legal protection. . . . According to some authorities, the tort also includes acts analogous to 'passing off,' such as the sale of confusingly similar products, by which a person exploits a competitor's reputation in the market. . . . " (Citations omitted.)

We shall accept, for the purpose of this analysis, that trade dress infringement can constitute a species of unfair competition for which damages are available. Appellants' contention, however, requires that we interpret whether, in the circumstances of this case, the following language in Canadian's policy encompasses the infringement of trade dress claim: "This insurance does not apply . . . to advertising injury *arising out of* . . . infringement of trademark . . . other than titles or slogans, by use thereof on or in connection with goods [or] products . . . sold [or] offered for sale . . . ." (Italics added.)[18]

Courts in California and elsewhere have consistently given a broad interpretation to terms such as "arising out of" in various kinds of insurance provisions. (See *Acceptance Ins. Co. v. Syufy Enterprises* (1999) 69 Cal.App.4th 321, 328-329 [81 Cal.Rptr.2d 557], and cases cited.) ▮ "It is settled that this ['arising out of'] language does not import any particular standard of causation or theory of liability into an insurance policy. Rather,

---

[17]The policy construed in *Lebas* covered injury arising from " 'misappropriation of an advertising idea or style of doing business' " and did not exclude coverage for trademark infringement. (*Lebas, supra,* 50 Cal.App.4th at p. 558.) The *Lebas* court held that those provisions obligated the insurer to defend a claim for infringement of registered trademarks.

[18]The italicized language is not found in the Truck policy construed in *Palmer*, and the contention made here by appellants was not made in that case.

it broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship." (*Id.* at p. 328.) Thus, if there is a minimal causal connection between appellants' injury and "trademark infringement," as used in the Canadian policy, appellants' claim is not within the coverage of the policy.

What is meant by the term "trade dress" is explained in the Restatement Third of Unfair Competition, as follows: "The term 'trade dress' is often used to describe the overall appearance or image of goods or services as offered for sale in the marketplace. 'Trade dress' traditionally includes the appearance of labels, wrappers, and containers used in packaging a product . . . . [¶] Although not originally classified as 'trademarks,' distinctive packaging . . . [was] afforded protection through the common law action for 'unfair competition.' . . . Nonfunctional packaging . . . [is] eligible for registration as [a] trademark[] under the Lanham Act, and unregistered features are protectable under § 43(a) of the Act [(15 U.S.C. § 1125(a))]. . . ." (Rest.3d Unfair Competition, § 16, com. a, p. 157.)

The Lanham Act defines "trademark" as including "any word, name, symbol, or device, or any combination thereof . . . ." (15 U.S.C. § 1127.) Package design may be registered as a trademark under the Lanham Act. (E.g., *Application of World's Finest Chocolate, Inc.* (C.C.P.A. 1973) 474 F.2d 1012 [design and shape of candy packaging]; *Application of Swift & Co.* (C.C.P.A. 1955) 223 F.2d 950 (*Swift & Co.*).) The package at issue in *Swift & Co.* was a round can containing a household cleanser; the label consisted of two horizontal bands of polka dot design in red background and white dots separated by a white band with the words "Swift's Cleanser," repeated, and other printed matter. The court held: "[W]e think appellant's polka dot banding design is a trade-mark 'device' distinguishing its product from articles of like kind sold by others, and that it is so recognized by the public as a primary means of identification." (*Swift & Co., supra,* 223 F.2d at p. 955.)

The Restatement discusses the relationship between trademarks and trade dress, as follows: "The law of trademarks deals primarily with designations consisting of words or other symbols used to indicate the source of goods or services. However, the manner in which the goods or services are presented to prospective purchasers, or the physical features of the product itself, may also serve as an indication of source. Source significance may attach, for example, to the overall appearance of a product or its packaging, or to some specific element or aspect of that appearance. The appearance [i.e., the trade dress] then functions as a trademark, distinguishing the goods or services of

one seller from those of others." (Rest.3d Unfair Competition, § 16, com. *a*, p. 157.)

That trade dress is a species of trademark is persuasively articulated in *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.* (7th Cir. 1986) 781 F.2d 604 (*Blau*). In that case the appellant insisted that it was claiming an infringement of trade dress, not trademark. The court responded: "[T]here is probably no substantive legal difference between these terms, and certainly none that helps [the appellant]. It is of course true that section 43(a) of the Lanham Act [(15 U.S.C. § 1125(a))] is not limited to trademark infringement. In fact it does not mention trademarks. It provides a remedy for trademark infringement only because that is a type of unfair competition, and it provides a remedy for other types as well. 'Trade dress,' a commonly used term in the law of unfair competition, denotes the form in which a producer presents his brand to the market; thus a label, a package, even the cover of a book might be trade dress. . . . If a seller adopts a trade dress confusingly similar to a competitor's, this is unfair competition actionable under section 43(a). . . . [¶] Because the statute is not limited to trademark infringement and in any event protects unregistered (common law) trademarks as well as federally registered trademarks, courts have generally not thought it important whether trade dress is a form of trademark; but it is, as [the appellant] implicitly acknowledges by its heavy reliance on *Chevron Chemical Co. v. Voluntary Purchasing, Inc.* 659 F.2d 695 (5th Cir.1981)[, certiorari denied (1982) 457 U.S. 1126 [102 S.Ct. 2947, 73 L.Ed.2d 1342] (*Chevron*)]. The plaintiff's trade dress in that case consisted of its registered trademark (the brand name) plus the distinctive design that formed the background on which the name was printed on the package in which the plaintiff's product was sold to the consumer. Hence the suit was essentially one to enforce a common law trademark in an ensemble consisting of the trade name and the background design. The court of appeals applied the principles of trademark law, see *id.* at 702, prompting one commentator to remark that the case 'brought trade dress cases into the mainstream of trademark law.' . . . [¶] And high time. . . ." (*Blau, supra,* 781 F.2d. at p. 608, citations omitted.)

In *Two Pesos, Inc. v. Taco Cabana, Inc.* (1992) 505 U.S. 763 [112 S.Ct. 2753, 120 L.Ed.2d 615] (*Two Pesos*), the Supreme Court agreed with the reasoning in *Chevron* and *Blau.* The court held that if the trade dress, for which protection is claimed under section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), is inherently distinctive, it is capable of identifying products as coming from a specific source, and secondary meaning is not

required for recovery.[19] "This is the rule generally applicable to trademarks, and the protection of trademarks and trade dress under § 43(a) serves the same statutory purpose of preventing deception and unfair competition. There is no persuasive reason to apply different analysis to the two." (505 U.S. at p. 773 [112 S.Ct. at p. 2760].)

This discussion has demonstrated that trade dress and trademarks may be registered under the Lanham Act, in which event they will be protected under section 32(1)(a) of the act (15 U.S.C. § 1114(1)(a)), or they may be unregistered, in which case they may be protected under section 43(a) of the act (15 U.S.C. § 1125(a)). Appellants in this case obtained protection for their registered trademark under section 32(1)(a), and they obtained protection for their unregistered trademark and the trade dress associated with both marks under section 43(a). *Two Pesos*, *Blau*, and *Chevron* demonstrate that false designation of origin claims brought under section 43(a) of the act, whether technically involving infringement of trademark or trade dress, are treated identically insofar as the elements necessary to establish those claims.

Our discussion of the relationship between infringement of trademarks and trade dress has focused on the meaning the law attaches to those terms. The issue remains whether the ordinary and popular sense of "infringement of trademark . . . by use thereof on or in connection with goods [or] products . . . sold [or]offered for sale" would be understood to include, in the circumstances of this case, both trademark and trade dress. A well-known general dictionary defines "trademark infringement" as "an appropriation or imitation that is likely to deceive ordinary or unwary buyers into accepting the goods of one trader as those of another—compare UNFAIR COMPETITION." (Webster's 3d New Internat. Dict. (1993) p. 2422, col. 1.) This definition is easily broad enough to take in both the overall appearance of a product's packaging (i.e., trade dress) and the trademark used on the packaging.

As for the circumstances of this case, the decision in the federal action makes clear that appellants' trademarks and trade dress were used together to make the product inherently distinctive and to identify the product as coming from a specific source: "[Rusty's] made and . . . distributed and sold, to markets and through distributors, potato chips packaged in bags

---

[19] "Secondary meaning is used generally to indicate that a mark or dress 'has come through use to be uniquely associated with a specific source.' . . . 'To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.' " (*Two Pesos*, *supra*, 505 U.S. at p. 766, fn. 4 [112 S.Ct. at p. 2756], citations omitted.)

bearing the [marks]. [¶] . . . Mr. Vasterling also developed a unique trade dress for the bag. The trade dress is distinctive consisting predominately [*sic*] of fanciful, non-functional and arbitrarily selected features which do not serve simply to describe the product or to assist in its effective packaging." (Paragraph numbers omitted.) In this situation, "the overall appearance of [the] product or its packaging . . . function[ed] as a trademark." (Rest.3d Unfair Competition, § 16, com. a, p. 157.)

We conclude, reading the policy as a layperson would, that where, as here, an unauthorized use of trade dress claim is made and joined with claims for infringement of registered and unregistered trademarks, all in relation to the packaging of a product sold and offered for sale, the trade dress claim would be understood to be encompassed within the exclusion for "injury arising out of . . . infringement of trademark . . . by use thereof on or in connection with goods [or] products . . . sold [or]offered for sale." In this situation, even if trademark infringement did not take in trade dress infringement, the significant causal connection between the injury and the trademark infringement results in the injury being excluded from coverage by the policy language quoted in the preceding sentence, when read with the insuring agreement. Accordingly, we hold that appellants' trade dress claim is not covered by the Canadian policy.

Appellants' statutory unfair competition claim, which is based on Business and Professions Code section 17200, is also precluded by the trademark exclusion clause, for the reasons we have just discussed. That claim is barred, as well, by *Bank of the West v. Superior Court, supra,* 2 Cal.4th 1254, 1272 (insurance coverage for "advertising injury" due to "unfair competition" does not refer to conduct that violates the Unfair Business Practices Act [(Bus. & Prof. Code, § 17200 et seq.)]).

Finally, appellants contend the portion of the policy defining "advertising injury" as "injury arising out of . . . piracy" covers their claim. For this proposition appellants cite *Iolab Corp. v. Seaboard Sur. Co.* (9th Cir. 1994) 15 F.3d 1500, 1506, which holds: "In the context of policies written to protect against claims of advertising injury, 'piracy' means misappropriation or plagiarism found in the elements *of the advertisement itself*—in its text form, logo, or pictures—rather than in the product being advertised." (Italics in original.) This contention is also defeated by the trademark exclusion clause, for the reasons we have discussed.

Our interpretation of the trademark exclusion clause does not cause the insuring agreement, insofar as it covers "injury aris[ing] out of . . . piracy

[or] unfair competition," to make an empty promise. Many situations remain potentially covered, as may be seen from the following examples found in the Restatement. "*A* and *B* are plumbing firms. *A* has a contract to provide plumbing services to the University of Nebraska. *B* falsely represents to prospective customers that it is the firm that does the plumbing work for the University. *B* is subject to liability to *A*." (Rest.3d Unfair Competition, § 4, illus. 1, p. 51.) "*A* designs dresses and sells the designs to dress manufacturers. *B*, a dress manufacturer, *C*, a wholesaler, and *D*, a retailer, sell dresses to their respective customers with the false representation that the dresses were designed by *A*. *B*, *C*, and *D* are subject to liability to *A*." (*Id.*, § 4, illus. 3, p, 51.) "*A* manufactures baseball gloves. In its advertising, *A* uses without consent a photograph of *B*, a famous baseball player, in a manner that falsely implies that *B* endorses *A*'s product. *A* is subject to liability to *B* . . . ." (*Id.*, § 4, illus. 5, p, 51; see cases cited in *id.*, § 4, rptr.'s notes, p. '55.) Accordingly, the coverage grant in the Canadian policy is not an empty or illusory promise.

## IV.  DISPOSITION

We hold that CIGA is not bound by the judgment in *Canadian v. Rusty's* and that Canadian's policy does not cover appellants' claims in the federal action. Accordingly, the judgment is affirmed. Respondent shall recover its costs on appeal.

Vogel (C. S.), P. J., and Epstein, J., concurred.

A petition for a rehearing was denied March 28, 2000, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied June 2, 2000.