690 A.2d 1059

MERRIMACK MUTUAL FIRE INSURANCE COMPANY, PLAIN-
TIFF–RESPONDENT, v. PETER COPPOLA, DEFENDANT–
APPELLANT, v. JOANN COPPOLA, DEFENDANT.

Superior Court of New Jersey
Appellate Division

Submitted February 13, 1997—Decided March 31, 1997.

Before Judges KING, KEEFE and CONLEY.

*Karl A. Fenske,* attorney for appellant (*Mr. Fenske,* on the brief).

*Colquhoun & Colquhoun,* attorneys for respondent (*Robert F. Colquhoun* and *Patricia L. Veres,* on the brief).

The opinion of the Court was delivered by

KEEFE, J.A.D.

Defendant Peter Coppola appeals from an order granting summary judgment to plaintiff Merrimack Mutual Fire Insurance Company (Merrimack). The judgment declared that Merrimack was not obligated to defend or indemnify defendant for his acts of abuse against his former wife under a homeowners policy. The issue to be decided is whether defendant's subjective intent with respect to the consequences of his alleged abusive behavior toward his wife is relevant in determining if coverage exists under his homeowner's policy that excludes indemnity for injuries expected or intended.

On May 20, 1992, Joann Coppola (Joann) filed for divorce. The First Count of the Complaint demanded a judgment of divorce on the ground of extreme cruelty, based on emotional and physical abuse throughout the marriage. The last specific allegation of physical threats and emotional abuse were Joann's accounts of incidents in March 1990. The Second Count of the Complaint,

incorporated the allegations of the First Count, and demanded judgment of divorce based on defendant's chronic alcoholism.

The Third Count of the Complaint incorporated the allegations of the First Count and demanded compensatory and punitive damages based upon the defendant's intentional physical and emotional abuse of Joann throughout the course of the parties' marriage, from July 17, 1965 to the date upon which the defendant was removed from the marital residence by a Restraining Order, on or about March 20, 1990. More specifically, Joann alleged 29 instances of physical and emotional abuse against herself and her children. She sought compensatory and punitive damages for her emotional and physical injuries. The Fourth Count of the Complaint alleged, in the alternative, that defendant negligently physically and emotionally abused Joann throughout the course of the parties' marriage. She sought compensatory injuries under that count. (The claims asserted against defendant in counts three and four of Joann's complaint will be referred to herein as the *Tevis* claims.[1])

Defendant made a demand upon Merrimack for coverage of the *Tevis* claims in Joann's complaint. Merrimack had issued a homeowner's policy to defendant, insuring premises located in Caldwell, New Jersey (not defendant's marital home), having a policy period from July 11, 1989 until July 11, 1990. Merrimack denied coverage, and filed this declaratory judgment action on April 26, 1993 against defendant and Joann.

Defendant filed his answer and counterclaim to Merrimack's complaint. Joann also filed an answer to the complaint. The declaratory judgment matter was consolidated with the divorce proceeding but severed for trial.[2]

---

[1] *Tevis v. Tevis*, 155 *N.J.Super.* 273, 382 A.2d 697 (App.Div.1978), *rev'd on other grounds*, 79 *N.J.* 422, 400 A.2d 1189 (1979).

[2] Defendant has made these assertions in his procedural history, but has not provided us with the order of consolidation or the order of severance.

The divorce complaint was tried first, and a Dual Judgment of Divorce was entered as a result of a settlement arrived at between Joann and defendant during the course of the trial. In Paragraph 16 of the judgment, defendant was required to transfer the sum of $20,000 from his IRA to Joann's IRA. In paragraph 20, the judgment provided that Joann's *Tevis* claim was deemed satisfied by defendant's assumption and satisfaction of the mortgage on the marital home and the $20,000 roll-over from defendant's IRA into Joann's IRA. Defendant claims in his appellate brief that the total settlement value was $30,000.

Subsequently, Judge Rocco D'Ambrosio granted Merrimack's motion for summary judgment, declaring that Merrimack did not cover defendant for the claims asserted by Joann, and dismissed defendant's counterclaim. This appeal followed.[3]

A more complete understanding of Joann's *Tevis* claim is revealed by the record from the divorce action which was submitted to the motion judge in connection with Merrimack's summary judgment motion. Plaintiff's complaint alleged a litany of physical and emotionally abusive behavior commencing shortly after their wedding in 1965 up to and including March of 1990. For example, in November 1979, defendant verbally abused and physically assaulted Joann twice in one night. The second time defendant hit her, Joann was holding their six-year old daughter, who defendant also hit and injured. Joann filed a report with the police and obtained a restraining order for the defendant to leave the residence. Joann began experiencing panic attacks after that incident.

Pertaining to the policy period at issue in this case (July 11, 1989 to July 11, 1990), Joann claimed that in October and November 1989, defendant's abusive behavior became more severe. According to Joann, defendant had violent temper tantrums, was

---

[3] Joann participated in the summary judgment proceedings before Judge D'Ambrosio but does not participate in this appeal.

critical of her and family members, and was constantly attempting to pick fights with her. She feared for her safety.

On December 30, 1989 defendant physically assaulted Joann, grabbing her arm and pulling her to the floor by her hair. As a result, she called the New Jersey Battered Woman's Service, who, in turn, telephoned the police. Joann obtained another restraining order on December 30, 1989 against the defendant requiring him to stay away from her and the children. He was also temporarily removed from the marital home.

On January 8, 1990, a Family Court judge entered a mutual order granting in-house restraints and forbidding harassing and violent activities between defendant and Joann. The court also ordered defendant to undertake counseling from the ACT program. (ACT is an acronym for Abuse Ceases Today.)

However, after two incidents on March 17 and 18, 1990, which included menacing behavior with a knife and kicking in Joann's bedroom door, Joann filed for a violation of the restraining order and also filed a domestic violence complaint. Defendant was removed from the house the same day. After defendant left the marital home on March 20, 1990, Joann did not report any more instances of abuse. On June 21, 1990 there was a final restraining order entered prohibiting defendant from harassing Joann or having any contact with her.

Joann began therapy with Barbara Hyatte Pressley, A.C.S.W., B.C.D., on October 28, 1989, and continued to see Pressley approximately once a week thereafter. Pressley is a clinical social worker. Joann was initially referred to Pressley by the New Jersey Battered Women's Center. Pressley diagnosed Joann with depressive neurosis, which is characterized by a depressed mood, low self-esteem, poor concentration, difficulty in making decisions, feelings of helplessness, insomnia or too much sleeping, overeating or a bad appetite, and fatigue. Pressley also diagnosed her with post-traumatic stress disorder which is anxiety produced from a history of abuse. Pressley concluded that Joann's condition was the result of constant emotional abuse, including belittling, criti-

cism, intimidation, as well as threats and actual physical violence by defendant. Pressley stated that Joann's symptoms and history are consistent with battered woman's syndrome.

On July 19, 1993, Merrimack served interrogatories on defendant. In response to the question of whether the incidents in Joann's complaint occurred, and if so, whether they were intentional, defendant alleged the incidents were "grossly exaggerated," but admitted that "[t]he parties did have several altercations," and that "the incidents which resulted in domestic violence actions did occur." Defendant also responded that he never intended to hurt his wife.

Defendant, in his appellate brief, admits that there were arguments between himself and his wife which "boiled over into pushing and shoving, hair-pulling, scratching and the like." Defendant also admits there was "some corroboration of the allegations of the complaint and answer and counter-claim in the medical records submitted at the divorce trial." However, defendant contends that he "did not intend to cause his wife to develop post-traumatic stress syndrome or battered women's syndrome," and further, that Joann's "condition was either one which occurred accidentally, or didn't occur at all, or occurred as a result of unintended consequences of intended acts." Defendant states that throughout the divorce action trial, he never admitted any act that could have caused Joann's injuries, that he was not at fault, and that his wife was exaggerating and manufacturing these claims.[4]

The policy affords coverage for "bodily injury ... caused by an occurrence...." An "occurrence" is defined as "an accident ... which results, *during the policy period,* in: (a) bodily injury ..." [emphasis added]. "Bodily injury" is defined in the policy as "bodily harm, sickness or disease, including required care, loss of services and death that results." Excluded from coverage is "bodily injury ... which is expected or intended by the insured."

---

[4] The divorce action settled before defendant testified.

■ Joann alleged only one incident of physical abuse, December 30, 1989, that falls within the policy term. It is clear that any injury caused by that physical assault is "bodily injury" under the policy, and is potentially covered unless excluded. Beyond that incident, however, Joann contended that there was emotional abuse that occurred on various occasions during the same time period. In *Voorhees v. Preferred Mut. Ins. Co.*, 128 *N.J.* 165, 607 *A.*2d 1255 (1992), the Supreme Court made it clear that emotional injuries accompanied by physical manifestations are covered under "bodily injury" insurance policies. *Id.* at 179, 607 *A.*2d 1255. However, emotional injuries unaccompanied by physical manifestations are not "bodily injuries" and are not covered. *SL Industries v. American Motorists*, 128 *N.J.* 188, 201–203, 205, 607 *A.*2d 1266 (1992). Thus, there is potential coverage for the emotional injuries claimed by Joann, to the extent that there were physical manifestations and coverage is not excluded.

It is clear from the recitation of the proofs offered by Joann in the divorce trial that she was asserting acts of intentional misconduct, as opposed to negligence, as grounds for her *Tevis* claim. The language in the policy clearly precludes "coverage for insureds whose conduct is intentionally wrongful." *Voorhees, supra,* 128 *N.J.* at 180, 607 *A.*2d 1255. The Court in *Burd v. Sussex Mutual Ins. Co.*, 56 *N.J.* 383, 267 *A.*2d 7 (1970), explained the public policy reasons for excluding coverage for intentional injury caused by the insured.

> The exclusion of intentional injury from coverage stems from a fear that an individual might be encouraged to inflict injury intentionally if he was assured against the dollar consequences ... Pulling the other way is the public interest that the victim be compensated, and the victim's rights being derivative from the insured's, the victim is aided by the narrowest view of the policy exclusion consistent with the purpose of not encouraging an intentional attack.
>
> [*Burd, supra,* 56 *N.J.* at 398–399, 267 *A.*2d 7 (citation omitted) ].

The Court in *Voorhees* explained the distinction between "intentional" and "accidental" acts. The Court held

> that the accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury. If not, then the resulting injury is "accidental," even if the act that caused the injury was

intentional. That interpretation prevents those who intentionally cause harm from unjustly benefiting from insurance coverage while providing injured victims with the greatest chance of compensation consistent with the need to deter wrong-doing.

[*Id.* at 183, 607 *A*.2d 1255.].

■ How then does one determine whether there was an "intent to injure?" The Court in *Voorhees* noted that "[t]he general trend appears to require an inquiry into the actor's subjective intent to cause injury." *Id.* at 184, 607 *A*.2d 1255. Indeed, the Court held: "Absent exceptional circumstances that objectively establish the insured's intent to injure, we will look to the insured's subjective intent to determine intent to injure." *Id.* at 185, 607 *A*.2d 1255. It is the intent to injure, rather than the intent to commit the act that is important. *SL Industries v. American Motorists,* 128 *N.J.* 188, 207, 607 *A*.2d 1266 (1992).

■ That is not to say, however, that the actor's subjective intent must always be a matter for jury determination simply because the actor claims he or she had no intent to injure, although fully intending the act. There are occasions where the objective conduct of the actor also determines the actor's subjective intent to injure. Such is the case where the actor engages in assault and battery. *Malanga v. Manufacturers Cas. Ins. Co.,* 28 *N.J.* 220, 225, 146 *A*.2d 105 (1958). The very nature of the conduct imputes the actor's subjective intent to cause some injury to the victim. *Ibid.; See also, SL Industries, supra,* 128 *N.J.* at 208–209, 607 *A*.2d 1266 (holding that where common law fraud is alleged an intent to injure is presumed). Where, as here, the plaintiff claims no more than the type of injuries that are inherently probable from such conduct there is no need to inquire into defendant's subjective intent. *Cf Prudential v. Karlinski,* 251 *N.J.Super.* 457, 464, 598 *A*.2d 918 (App.Div.1991) (stating the converse of this proposition, i.e., "where the intentional act does not have an inherent probability of causing the degree of injury actually inflicted, a factual inquiry into actual intent of the actor to cause that injury is necessary."). Thus, we are satisfied that no coverage is afforded defendant as a matter of law for the one act

of physical assault that allegedly occurred during the policy period.

■    The more difficult issue concerns the claim of verbal abuse and harassment directed toward Joann which she claimed resulted in bodily injury.  The focus, of course, is on those acts which occurred during the policy period.  Defendant does not deny that his conduct could be considered abusive in some instances.  He simply contends that he did not intend to cause injury to Joann as a result of his behavior.  Whether Merrimack had the duty to defend defendant as to those allegations depends on whether it would have a duty to indemnify him if plaintiff successfully proved her claim.  *Voorhees, supra,* 128 *N.J.* at 180, 607 *A.2d* 1255.  If there is no duty to indemnify defendant under any version of Joann's allegations, Merrimack had no duty to defend him or bear the cost of his defense.  *Ibid.*

The Supreme Court has recognized that

> [w]hen the actions are particularly reprehensible, the intent to injure can be presumed from the act without an inquiry into the actor's subjective intent to injure.  That objective approach focuses on the likelihood that an injury will result from an actor's behavior rather than on the wrongdoer's subjective state of mind.
>
> *[Voorhees, supra,* 128 *N.J.* at 184, 607 *A.2d* 1255.]

Where the insured's conduct was deemed reprehensible the objective approach was used by this court in *Atlantic Employers v. Tots & Toddlers,* 239 *N.J.Super.* 276, 571 *A.2d* 300 (App.Div.), *certif. denied,* 122 *N.J.* 147, 584 *A.2d* 218 (1990).  In that case the insured was sued for his sexual abuse of children in a day-care center, and the plaintiff-intervenors argued that the actor's subjective intent was relevant and was a matter for a jury to determine.  The plaintiff-intervenors cited to case law from another jurisdiction in which "two doctors testified that pedophiles consider sexual contact to be part of a caring relationship and do not intend to harm their victims."  *Id.* at 283, 571 *A.2d* 300.  We rejected that notion saying:

> As a matter of public policy and logic we conclude that the better rule warrants application of the objective approach.  A subjective test suggests that it is possible to molest a child and not cause some kind of injury, an unacceptable conclusion.

Certainly, one would and should expect some physical or psychological injury or both, to result from such acts.

[*Id.* at 283, 571 *A.*2d 300.]

There is some authority in our case law to support the conclusion that spousal abuse is so reprehensible that both public policy and logic require a presumption that the actor intended injury. In *Tevis v. Tevis,* 155 *N.J.Super.* 273, 382 *A.*2d 697 (App.Div.1978), *rev'd on other grounds,* 79 *N.J.* 422, 400 *A.*2d 1189 (1979), this court first recognized that interspousal immunity no longer applied to domestic violence and required such claims to be included in the divorce action. We noted the seriousness of spousal abuse and the fact that domestic violence is never simple nor negligent, and, therefore, insurance coverage for intentional acts of domestic violence is not available.

In a civilized society, wife-beating is, self-evidently, neither a marital privilege nor an act of simple domestic negligence. *Neither is any other intentional tort by which one spouse victimizes the other.* Nor, moreover, do any of the common-law reasons for interspousal immunity pertain to intentional torts ... Insurance coverage for such torts not being available as a matter of public policy, *see, e.g., Malanga v. Manufacturers Cas. Ins. Co.,* 28 *N.J.* 220, 225 [146 *A.*2d 105] (1955 [1958]), there is no carrier who might be defrauded.

[*Id.* at 278, 382 *A.*2d 697.]. (Emphasis added.)

The Supreme Court in *Brennan v. Orban,* 145 *N.J.* 282, 678 *A.*2d 667 (1996), also noted the seriousness of domestic violence and the public policy that undergirds the legislative and judicial efforts to remedy it.

[T]he distinction between serious and non-serious injuries does not find support in New Jersey constitutional doctrine ... we believe that there is no such thing as an act of domestic violence that is not serious. Every action of recent Legislatures has been intended to underscore the serious nature of the domestic violence problem in our society.

*Id.* at 298, 678 *A.*2d 667.

The Court in *Brennan* recognized the marital victim has a right to a jury trial for her *Tevis* claims "when the Family Part is convinced that society's interest in vindicating a marital tort through the jury process is the dominant interest in the matter[.]" *Id.* at 302, 678 *A.*2d 667. The Court acknowledged that in some cases, a jury trial will provide "the victim with the maximum

protection that the law can provide," which is the intended purpose of the Prevention of Domestic Violence Act, *N.J.S.A.* 2C:25–18. *Id.* at 306, 678 *A.*2d 667. However, it noted that in cases where the abusive spouse does not have substantial assets, "the lack of insurance coverage for intentional torts . . . may render the tort action an illusory remedy." *Id.* at 305, 678 *A.*2d 667. In making that observation, the Court acknowledged the soundness of Judge Pressler's statement in *Tevis* that insurance coverage is not available as a matter of public policy where spousal abuse has occurred.

▮▮▮ Given the fact that our Supreme Court has recognized the seriousness of spousal abuse, and has even considered the problem of domestic violence to be a "national epidemic," (*See Brennan, supra,* 145 *N.J.* at 298–299, 678 *A.*2d 667), allowing spouse abusers insurance coverage for their intentional abuse, whether it be physical or emotional, would contravene the public policy clearly enunciated by our Supreme Court, and the intent of the Legislature in its enactment of the Prevention of Domestic Abuse Act. Clearly, coverage for spousal abuse, in any form, would encourage those who are disposed to commit such reprehensible acts to inflict injury upon their spouses with impunity, knowing that their insurance companies will indemnify them for the money damages recovered by their spouses if only they can convince some jury that they did not intend or expect bodily harm to flow from their conduct. Therefore, we conclude that spousal abuse in any form is "so inherently injurious, that it can never be an accident," and therefore, "[a]s a matter of public policy and logic * * * the better rule warrants application of the objective approach," to the end that the intent to injure is presumed from the performance of the act. *Voorhees, supra,* 128 *N.J.* 165, 185, 607 *A.*2d 1255 (1992) (*quoting Atlantic Employers, supra,* 239 *N.J.Super.* at 283, 571 *A.*2d 300).

▮▮▮ There is an alternative basis for our determination that Merrimack has no duty to defend or indemnify in the circumstances of this case. In *Morton Intern. v. General Acc. Ins.,* 134

*N.J.* 1, 629 *A.*2d 831 (1993), *cert. denied* 512 *U.S.* 1245, 114 *S.Ct.* 2764, 129 *L.Ed.*2d 878 (1994), the Supreme Court addressed the question of whether pollution was such reprehensible conduct that an intent to injure should be presumed as a matter of law. *Id.* at 86, 629 *A.*2d 831. The Court concluded that there was no warrant for such a presumption because experience had shown that "insureds held responsible for remediation of environmental pollution vary significantly in their degree of culpability for the harm caused by pollutant discharges." *Ibid.*

Instead, the Court elected to determine whether coverage should be provided on a "case-by-case" basis. *Ibid.* In coming to that conclusion, the Court relied on *Voorhees, supra,* in which it said that the objective test for determining intent can be used in "exceptional circumstances that objectively establish the insured's intent to injure." *Ibid.* (quoting *Voorhees, supra,* 128 *N.J.* at 185, 607 *A.*2d 1255). Using that test, the Court looks to the "available evidence" in the trial court record, such as the duration of the conduct, the quality of the act (intentional or negligent), and the quality of the insured's knowledge concerning the impact of its conduct. *Ibid.* If an evaluation of the record considering those and other relevant factors demonstrates that "environmental injury had been intended or expected" a declaration of no coverage will be sustained. *Id.* at 87, 629 *A.*2d 831. In some respects the analysis that is undertaken is similar to that undertaken under *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 666 *A.*2d 146 (1995). If no reasonable fact finder could find in favor of the insured who claims there was no expectation of injury or intent to injure, objective intent can be found as a matter of law.

Even if we were to ignore the public policy that so strongly undergirds this State's efforts to combat spousal abuse, and conclude that this case should not be analyzed in the same way as sexual assault is analyzed, we must at least conclude that spousal abuse constitutes "exceptional circumstances" if environmental pollution deserves such recognition. Accordingly, we apply the

factors described in *Morton Intern., supra,* 134 *N.J.* at 86, 629 *A.*2d 831, to this record.

Plaintiff's proofs reflect long term abuse, both physical and verbal, over a twenty-five year span from 1965 to 1990. As *Tevis* states, such conduct can never be considered negligent. *Tevis, supra,* 155 *N.J.Super.* at 277, 382 *A.*2d 697. During that same period of time, defendant was aware that Joann considered his conduct to be serious enough that she was required to seek medical aid for her physical injuries and ultimately counseling for her psychological injuries. Further, Joann was required to seek judicial intervention on several occasions. Indeed, on one occasion defendant's conduct was serious enough to warrant the court to order that he attend abuse counseling at ACT. To claim under such circumstances that defendant did not expect or intend any injury to his wife is disingenuous at best. A plenary trial on that issue is simply not warranted.

Finally, we observe that an abused spouse will not be left without a remedy if the abuser's homeowner's insurance is found not to cover *Tevis* claims. In almost all divorce actions, there are equitable assets to distribute. Therefore, as was done in this case, the abused spouse's claims will be compensated by a greater share of the marital assets.

Affirmed.