821 A.2d 1174 (2002)
360 N.J. Super. 166
VILLA ENTERPRISES MANAGEMENT LTD., Plaintiff,
v.
FEDERAL INSURANCE COMPANY, Defendant.
Superior Court of New Jersey, Law Division, Morris County.
Decided October 11, 2002.
*1178 Craig S. Provorny, Warren, for Plaintiff Villa Enterprises Management Ltd. (Herold and Haines, P.A., attorneys).
Marc I. Bressman, Short Hills, for Defendant Federal Insurance Company (Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, attorneys). *1175 *1176
*1177 MINIMAN, J.S.C.
The parties in this action seek a summary declaration of their rights under a comprehensive general liability insurance policy. Federal Insurance Company ("Federal") has refused to defend and indemnify Villa Enterprises Management LTD. ("Villa Enterprises") for damages stemming from Nevada litigation over alleged advertising injury and unfair competition practices arising from Villa Enterprises' use of the term VILLA PIZZA ®, a trademarked and service-marked name owned by Villa Pizza Nevada, Ltd. ("Villa Nevada"), plaintiff in the Nevada litigation. The policy language excludes coverage generally for infringement of trademarks and service marks; however, it provides insurance protection for infringement of trademarked or service-marked titles.
Federal urges that the word "title" means, exclusively, the name of a literary work and that its duty to defend and indemnify extends only to trademarked and service-marked names of literary works. Thus, Federal argues that the underlying dispute over the trademarked and servicemarked name VILLA PIZZA ® is excluded from coverage. Presumably, it would concede that an infringement of "DANTE'S INFERNO PIZZA®" would be covered. Federal's tortured definition of "title" in the context of this comprehensive general liability policy and New Jersey law governing construction of insurance policies cannot be sustained.
Plaintiff Villa Enterprises is a New Jersey corporation engaged in the business of managing and operating a chain of restaurants. The restaurants, operating under the name VILLA PIZZA ®, are located in various parts of the United States. Plaintiff was and is the owner of several trademark registrations for VILLA PIZZA ®, including a federal registration filed in 1983. In 1999, Villa Enterprises sought to expand its business operations to Las Vegas; its Nevada restaurant was scheduled to open in 2000. However, Villa Nevada had been operating restaurants in the Las Vegas area under the Nevada trademarked and service-marked name VILLA PIZZA ® since December 24, 1975.
It is undisputed that Villa Nevada filed an action against Villa Enterprises in the United States District Court for the District of Nevada and that plaintiff here timely demanded defense and indemnification *1179 from Federal. The Nevada complaint makes allegations which indisputably would fall within a broad definition of trademarked or service-marked title.[1]
The first count of the complaint seeks a declaration of Villa Nevada's rights to the VILLA PIZZA® service mark. The second count alleges a false designation of origin in violation of the Trademark Act based on Villa Enterprises' use of the VILLA PIZZA® service mark. The third count alleges that the "Plaintiff's VILLA PIZZA mark is of distinctive quality and fame in the Las Vegas area, and is identified with Plaintiff's restaurants." This count seeks relief for a trademark dilution in violation of the Trademark Act. The fourth count seeks relief for infringement of the state trademark for VILLA PIZZA®. The fifth count alleges a violation of the state Deceptive Trade Practices Act based on defendant's use of the VILLA PIZZA® mark. The sixth count alleges that "[b]y making continuous use of the VILLA PIZZA service mark in and around Las Vegas for the last 25 years, Plaintiff has acquired common law service mark rights in the VILLA PIZZA name" and seeks relief for common law trademark and service mark infringement. Finally, the seventh count alleges common law unfair competition.
After Federal declined defense and indemnification, the Nevada parties entered into a settlement resolving the action. Villa Enterprises duly notified Federal of the proposed settlement; however, Federal refused to participate and the Nevada action was concluded. Villa Enterprises seeks a declaration of its rights and recovery of *1180 the amount of the settlement and the cost of defense. The issues now before the court are the declaration of rights and the viability of plaintiff's claim of bad faith and its demand for punitive damages.
The insurance policy at issue establishes the parameters of coverage. The policy provides in pertinent part:
Subject to the applicable Limits of Insurance, we will pay damages the insured becomes legally obligated to pay by reason of liability imposed by law ... for:
advertising injury ... to which this insurance applies caused by an offense.
The policy defines "advertising" as any advertisement, publicity, article, broadcast or telecast, and defines "advertising injury" as
injury ... arising solely out of one or more of the following offenses committed in the course of advertising of your goods, products or services:
infringement of copyrighted advertising materials or infringement of trademarked or service marked titles or slogan.

(Emphasis added.)
Not all advertising injuries are covered. The policy provides:
This insurance does not apply to ... advertising injury ... arising out of or directly or indirectly related to the actual or alleged publication or utterances of oral or written statements, whether made in advertising or otherwise, which is claimed as an infringement, violation or defense of any of the following rights or laws:
copyright, other than infringement of copyrighted advertising materials;
...
...
...
trademark or service mark or certification mark or collective mark or trade name, other than trademarked or service marked titles or slogans.

(Emphasis added.)
The issue presented by the policy language requires that the court consider: What are trademarks and service marks and how are they different from trademarked or service-marked titles? The answer to this pivotal question will determine coverage in this declaratory judgment case.
It is important to begin by noting that the scope of advertising injury coverage has not been resolved in this jurisdiction. Tradesoft Technologies, Inc. v. Franklin Mut. Ins. Co., Inc., 329 N.J.Super. 137, 142, 746 A.2d 1078 (App.Div.2000).[2] In addition to the lack of precedent, the policy itself neither defines "trade-marked or service-marked titles" nor draws a distinction between them and the more general category of "trademarks and servicemarks." Courts of foreign jurisdictions, when presented with similar policy language, have turned to dictionaries for assistance in defining policy terms using ordinary *1181 language.[3]
Webster's II New College Dictionary contains a short definition of "trademark":
1. a name, symbol or other device identifying a product, officially registered and legally restricted to the use of the owner or manufacturer; 2. A distinctive sign or characteristic by which a person or thing comes to be known. [Id. at 1196]
Black's Law Dictionary (4th ed.1968) has a more detailed definition:
Generally speaking, a distinctive mark of authenticity, through which the products of particular manufacturers or the vendible commodities of particular merchants may be distinguished from those of others. It may consist in any symbol or in any form of words, but, as its office is to point out distinctively the origin or ownership of the articles to which it is affixed, it follows that no sign or form of words can be appropriated as a valid trademark which, from the nature of the fact conveyed by its primary meaning, others may employ with equal trust and with equal right for the same purpose.
A distinctive mark, motto, device, or emblem, which a manufacturer stamps, prints, or otherwise affixes to the goods he produces, so that they may be identified in the market, and their origin be vouched for [Id at 1665-66 (emphasis added).]
Black's does not define "service mark" but Webster's offers the following definitions:
A symbol or mark used in the sale or advertising of services to distinguish them from the services of others. [Webster's, supra, at 1010 (emphasis added).]
"Title" in Webster's is defined as:
1. An identifying name given to a book, play, film, musical composition or work of art. 2. A general or descriptive heading, as of a book chapter.... 9. A descriptive appellation: EPITHET.... [Webster's, id, at 1157.]
Black's has a broader definition:
The radical meaning of this word appears to be that of a mark, style, or designation; a distinctive appellation; the name by which anything is known....
The title of a book, or any literary composition, is its name; that is, the heading or caption prefixed to it, and disclosing the distinctive appellation by which it is to be known.... [Black's, supra, at 1655.]
Specifically referencing the "Law of Trade-Marks," Black's goes on to indicate that:
A title may become a subject of property; as one who has adopted a particular title for a newspaper, or other business enterprise, may, by long and prior user, or by compliance with statutory provisions as to registration and notice, acquire a right to be protected in the exclusive use of it. [Id.]
*1182 With these linguistic definitions as a starting point, the court turns to New Jersey case law governing interpretation of insurance policies generally. New Jersey courts have consistently regarded insurance contracts as contracts of adhesion and, consequently, subject to special rules of interpretation. Progressive Cas. Ins. Co. v. Hurley, 166 N.J. 260, 272, 765 A.2d 195 (2001). Courts apply strict scrutiny to such contracts "because of the stark imbalance between insurance companies and insureds in their respective understanding of the terms and conditions of insurance policies." Gibson v. Callaghan, 158 N.J. 662, 669, 730 A.2d 1278 (1999).
At the outset of a dispute over insurance coverage, it is "the insured's burden to bring the claims within the terms of the policy." Sears Roebuck and Co. v. National Union Fire Ins. Co., 340 N.J.Super. 223, 234, 774 A.2d 526 (App. Div.2001). In considering such a claim, "the words of an insurance policy should be given their ordinary meaning." Longobardi v. Chubb Ins. Co. of New Jersey, 121 N.J. 530, 537, 582 A.2d 1257 (1990). The claim must then be compared with the policy language. Tradesoft, supra, 329 N.J.Super. at 143, 746 A.2d 1078. If the language corresponds, "the duty to defend arises, irrespective of the claim's actual merit." Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 173, 607 A.2d 1255 (1992). Finally, and for present purposes most important, any ambiguity must be resolved in the insured's favor. Id. at 175, 607 A.2d 1255. This final point is critical to the court's determination, and requires a more thorough presentation.
Where there is an ambiguity in an insurance contract, courts interpret the meaning considering the reasonable expectations of the insured, regardless if a close reading of the policy reveals a contrary meaning. Meier v. New Jersey Life Ins. Co., 101 N.J. 597, 611-612, 503 A.2d 862 (1986). Put differently, "the objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." Sparks v. St. Paul Ins. Co., 100 N.J. 325, 338-339, 495 A.2d 406 (1985), quoting R. Keeton, Insurance Law Rights at Variance with Policy Provisions, 83 Harv. L.Rev. 961, 967 (1970).
This principle, known as the doctrine of "reasonable expectations," was created by the Supreme Court in Kievit v. Loyal Protective Life Ins. Co., 34 N.J. 475, 170 A.2d 22 (1961). The doctrine conceived in Kievit remains alive in our jurisprudence:
The Court's goal in construing an accident insurance policy is to effectuate the reasonable expectations of the average member of the public who buys it; he may hardly be expected to draw any subtle or legalistic distinctions based on the presence or absence of the exclusionary clause for he pays premiums in the strong belief that if he sustains accidental injury ... he will be indemnified and not left empty-handed .... [Id. at 488-489, 170 A.2d 22.]
It goes without comment that application of this standard has not been limited to automobile accident coverage.
Under this doctrine, courts must interpret the policy "to accord with the reasonable expectations of the insured." Doto v. Russo, 140 N.J. 544, 556, 659 A.2d 1371 (1995). The analysis requires that an "objectively reasonable interpretation of the average policyholder is accepted so far *1183 as the language of the insurance contract in question will permit." DiOrio v. New Jersey Mfgs. Ins. Co., 79 N.J. 257, 269, 398 A.2d 1274 (1979).
In order for a court to deny coverage to an insured, the policy language must be found fundamentally clear upon a plain reading of its words. See, e.g., Zacarias v. Allstate Ins. Co., 168 N.J. 590, 775 A.2d 1262 (2001) (court declares boatowner policy's intra-family exclusion unambiguous, citing large boldfaced type and use of ordinary language that specifically excluded injury to insureds and any relatives living in household); Powell v. Alemaz, 335 N.J.Super. 33, 760 A.2d 1141 (App.Div. 2000) (Appellate Division denies coverage on ground that landlord's alleged racial discrimination against tenant was not "personal injury" and, consequently, not covered); Stafford v. T.H.E. Ins. Co., 309 N.J.Super. 97, 706 A.2d 785 (App.Div.1998) (insured night club not entitled to coverage after the shooting of a patron, where policy language specifically excludes injury "arising out of or caused in whole or in part by an assault and/or battery").
These cases reveal a common conclusion: Denial of insurance coverage will only be permitted in the face of unambiguous plain language clearly excluding such coverage. While the scope of advertising injury coverage has not been decided by our courts, this overarching policy governing interpretation and application of insurance contracts is constant.
The Progressive Court was faced with a similarly unsettled question concerning insurance coverage. While the substantive issues differ from those in the present case, the Court's rationale provides considerable direction in resolving the coverage issue here.
The Court addressed the issue of uninsured motorist coverage: Was the owner of a closely held corporation entitled to coverage under his business automobile policy? Id. at 263, 765 A.2d 195. Overruling the Law and Appellate Divisions, and rejecting the majority view of other jurisdictions, the Court declared that insurance coverage was required.
Similar to the present case, the Court was confronted with a narrow question lacking analysis in New Jersey case law.[4] In recognizing the absence of jurisdictional guidance, the Court referenced foreign jurisprudence. After providing an extensive analysis of case law from other states,[5] the Court concluded that the "majority view" among other jurisdictions is that such insurance policies were not ambiguous and, consequently, do not trigger coverage. Id. at 268-269. In rejecting this majority view, the Court relied on New Jersey's well settled policy resolving ambiguity in favor of the insured. Id. at 272, 765 A.2d *1184 195, citing Cruz-Mendez v. ISU Ins. Services, 156 N.J. 556, 571, 722 A.2d 515 (1999); Doto, supra, 140 N.J. at 556, 659 A.2d 1371; and Hunt v. Hospital Service Plan of New Jersey, 33 N.J. 98, 102, 162 A.2d 561 (1960).
The Court observed that it would not engage in "a strained construction to support the imposition of liability," Progressive, supra, 166 N.J. at 273, 765 A.2d 195, citing Brynildsen v. Ambassador Ins. Co., 113 N.J.Super. 514, 518, 274 A.2d 327 (Law Div.1971), and that courts "should not write for the insured a better policy of insurance than the one purchased." Progressive, supra, at 273, 765 A.2d 195, quoting Longobardi, supra, 121 N.J. at 537, 582 A.2d 1257. Nonetheless, it was direct in its conclusion: "When a policy is unclear, ambiguities are ordinarily resolved in favor of the insured." Progressive, supra, 166 N.J. at 273, 765 A.2d 195. "Where the policy language supports two meanings, one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied." Lundy v. Aetna Cas., 92 N.J. 550, 559, 458 A.2d 106 (1983), cited with approval in Progressive, supra, at 273, 765 A.2d 195.
Here, in attempting to justify the denial of coverage to its insured, Federal relies on two California cases.[6] The policy language addressed in these foreign cases is similar but not identical to that now before the court. In essence, the decisions stand for the proposition that nonliterary "titles" and "slogans" are not covered under the "advertisement injury" provision of a comprehensive general liability policy containing an exclusion for trade marks, service marks and trade names.
In Palmer v. Truck Ins. Exchange, 21 Cal.4th 1109, 90 Cal.Rptr.2d 647, 988 P.2d 568 (1999), the California Supreme Court had before it a policy which provided coverage for advertising liability including "infringement of copyright or of title or of slogan." However, an exclusionary clause stated that with respect to advertising injuries the insurance did not apply:
to claim made against the insured for... infringement of registered trade mark, service mark or trade name by use thereof as the registered trade mark, service mark or trade name of goods or services sold, offered for sale or advertised, but this shall not relate to titles or slogans .... [Id. at 1117, 90 Cal.Rptr.2d 647, 988 P.2d 568 (emphasis added).]
Plaintiff had earlier been found liable for infringement of the registered mark "Valencia ®" through the use of that mark in connection with its real estate developments. It sought coverage arguing that liability had been imposed for infringement of title, thus seeking to avoid the exclusion for registered mark and trade name infringement. Id. at 1114, 90 Cal.Rptr.2d 647, 988 P.2d 568.
In construing the policy, the California Supreme Court observed that nothing in the policy itself suggested that "title or slogan" had a different meaning in the two clauses at issue. Id. at 1117, 90 Cal. Rptr.2d 647, 988 P.2d 568. It began by construing the exclusionary clause as a whole and determined that it excluded "coverage for infringement of a `registered trade mark, service mark or trade name' unless that `trade mark, service mark or trade name' is a title or slogan." Id. Having *1185 so construed the exclusionary clause, the court determined that the definition of title could not "subsume the definitions of `trade mark,' `service mark,' or `trade name' as understood in the Policy." Id. Then, ostensibly to avoid rendering the exclusionary clause meaningless, the court struggled to define title in a fashion that would make title a subset of trade marks, service marks, and trade names.
Working within the frame of this logical construct, the court was compelled to reject the insured's contention that title should be broadly defined as " `a descriptive name [or] epithet.' " Id. at 1116, 90 Cal.Rptr.2d 647, 988 P.2d 568. The insured argued that this definition would still preclude coverage for trade dress infringement if "title" meant "any name." Id. at 1118, 90 Cal.Rptr.2d 647, 988 P.2d 568. The court reasoned that defining title to mean "any name" would nonetheless abrogate the exclusion for trade name infringement because "trade names" are names " `used by a person to identify his or her business or vocation' " and are thus a subset of "any name." Id. at 1117-18, 90 Cal.Rptr.2d 647, 988 P.2d 568.
The court also rejected the suggestion of amicus curiae that "title" should be defined to encompass any legal right to property. Id. at 1116, 90 Cal.Rptr.2d 647, 988 P.2d 568. It noted that arguably all marks are a form of legal title and such a definition would render the entire exclusionary clause meaningless. Id. at 1118, 90 Cal. Rptr.2d 647, 988 P.2d 568.
Having rejected the above definitions, the court accepted the definition proposed by the insurer that "title" means the name of a literary or artistic work. Id. at 1117, 90 Cal.Rptr.2d 647, 988 P.2d 568. It reasoned that this definition of title would give effect to every part of the policy's trademark exclusion. Id. at 148, 90 Cal. Rptr.2d 647, 988 P.2d 568. The court concluded with the observation that where the meaning of a policy term is clear from the context of the policy as a whole, no ambiguity exists. Id. Thus the rule requiring the court to construe all ambiguities against the insurer would not apply. Id. Accord, Aloha Pacific, Inc., v. California Ins. Guarantee Ass'n, 79 Cal.App.4th 297, 316-17, 93 Cal.Rptr.2d 148 (2 Dist.2000).
In California under the policy language at issue in Palmer, coverage would thus be afforded to Catcher in the Rye Bread®, Raisin in the Sun Cookies®, Gulliver's Travels Agency® and Grapes of Wrath Vineyard®. However, coverage would not be available for Wonder Bread®, Famous Amos Chocolate Chip Cookies®, Liberty Travel Agency® and Gallo Vineyards®. Would such a distinction fall within the reasonable expectations of a New Jersey insured presented with similar inclusive and exclusive language? One would hardly think so, but the court need not decide the proper construction of the California policy because the language here at issue is distinctly different and the result reached in California is not appropriate here.
In this policy, coverage is not extended for titles and slogans generally but only for trademarked and servicemarked titles and slogans. The ordinary insurance consumer faced with Federal's language of coverage and exclusion would not begin with the assumption that "trademarks, service marks, certification marks,[7] *1186 collective marks[8] and trade names[9]" are a subset of "trademarked or servicemarked titles or slogans," but rather would begin with the converse assumption. The question thus becomes: How are trademarked or service-marked titles or slogans different from all other trademarks and service marks?[10]
Trademarks and service marks are devices used in connection with the sale or advertisement of products or services of particular merchants to distinguish them from similar products or services of others and identify the source of the trademarked products or servicemarked services. The Lanham Act states that the term "trademark" includes "any word, name, symbol, or device, or any combination thereof, adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." 3 Callmann on Unfair Competition, Trademarks and Monopolies, § 17:1 (Louis Altman ed., 4th ed.2002). According to Callmann, an even broader definition was proposed for Article 6 of the Paris Convention and that was "any mark or medium that can be conceived by the senses, that is capable of distinguishing merchandise, products or services of a ... person from those of another."
Although trademarks and services marks certainly may be trademarked or service-marked titles (Corel ® WordPerfect ®) or slogans (Ponds' "The Skin You Love to Feel"), they may also be symbols or emblems (McDonalds' golden arches M ®). Indeed, a color configuration is a "device" for the purposes of the Lanham *1187 Act definition. Shakespeare Co. v. Silstar Corp. of America, Inc., 802 F.Supp. 1386 (D.S.C.1992), rev'd on other grounds, 9 F.3d 1091 (4th Cir.1993). Purely audible marks may be registered, 3 Callmann, supra, at n. 4, and so too may a fragrance be registered as a mark. See In re Clarke, 17 U.S.P.Q.2d 1238 (TTAB 1990).
Viewed in this fashion, no tortured examination of various definitions of "title" need be made. Under the Federal policy before us, advertising injuries arising from a claim of infringement of a trademarked or service-marked title (i.e., any trademarked or service-marked name) is entitled to defense and indemnification whereas advertising injuries arising from a claim of infringement of other trademarked or service-marked words, symbols or devices are not covered, nor claims of infringement based on certification marks, collective marks and unregistered trade names. This analysis is consistent with the plain meaning of the clauses in ordinary language using the broadest definition of "title" recognized by all cited authorities, legal and linguistic, and follows the mandate of Longobardi to give insurance policy language its plain meaning.
If the court were to limit "title" to the definition urged by Federal, i.e., to trademarked and service-marked literary titles, it would do violence to the reasonable expectations of the average insured. Meier, supra, 101 N.J. at 611-612, 503 A.2d 862. Surely such an insured would conceive of "title" as a name, any name, an appellation, an epithet, any word by which a product or service is known. Who, reading the policy at issue, would think for a second that it would cover infringement of Catcher in the Rye Bread ® but not Wonder Bread ®?
Thus, the definition urged by Federal would itself create an ambiguity rather than resolve one, an ambiguity which would send insureds on a quixotic quest for literary works the title of which coincidentally mirrored the registered title alleged to have been infringed. The court therefore declines Federal's invitation to limit coverage for advertising injuries to infringement of trademarked or servicemarked literary titles.
The claims of the underlying action were covered by the "advertising injury" provisions in the comprehensive general liability policy. In fact, a review of the complaint supports this conclusion: The complaint directly charged that Villa Enterprises was "selling and advertising restaurant services competitive to those of Plaintiff by using Plaintiff's VILLA PIZZA mark in commerce in Las Vegas." The complaint repeatedly cites damages as stemming from Villa Enterprises' advertising tactics, as such activities utilized the Villa Pizza ® service mark. The infringement was clearly that of a name, a title. There is no suggestion in the complaint that the Villa Enterprises had infringed something other than a title, such as the smell or taste of Villa Nevada's pizza or any other type of mark but a name.
Additionally, Federal inappropriately neglected its duty to provide Villa Enterprises with a defense in the underlying litigation. A contract clause implementing a duty to defend is enforceable if there is a potentially covered occurrence that would be indemnified if proved valid. Stafford, supra, 309 N.J.Super. at 103, 706 A.2d 785. In fact, the duty to defend is broader than the duty to indemnify; if there are multiple claims alleged, only one of which is potentially covered, the duty to defend will continue until every covered claim is disposed. Conduit v. Hartford Cas. Ins. Co., 329 N.J.Super. 91, 105, 746 *1188 A.2d 1053 (App.Div.), cert. denied, 165 N.J. 135, 754 A.2d 1212 (2000); Voorhees, supra, at 174, 607 A.2d 1255.
Once coverage has been established, the burden shifts to the insurer to show that the claim falls within the exclusionary provisions of the policy. Adron, Inc. v. Home Ins. Co., 292 N.J.Super. 463, 473, 679 A.2d 160 (App.Div. 1996); Reliance Ins. Co. v. Armstrong, 292 N.J.Super. 365, 377, 678 A.2d 1152 (App.Div.1996). Such exclusionary clauses are enforceable only if clearly applicable. Nestle Foods Corp. v. Aetna Cas. and Surety Co., 842 F.Supp. 125, 131 (D.N.J.1993). Additionally, as is noted throughout, any ambiguity in an insurance policy should be construed against the insurer, and "exclusionary clauses should be strictly construed." Universal Underwriters Ins. v. New Jersey Mfgs. Ins. Co., 299 N.J.Super. 307, 312, 690 A.2d 1104 (App.Div.1997), cert. denied, 151 N.J. 73, 697 A.2d 546 (1997), quoting Sinopoli v. The North River Ins., 244 N.J.Super. 245, 250-251, 581 A.2d 1368 (App.Div.1990), cert. denied, 127 N.J. 325, 604 A.2d 600 (1991).
Similarly, Federal's contention that Villa Enterprises' actions were intentional in nature is without support. The comprehensive general liability policy provides that in order for an act to be so deemed, Villa Enterprises must have engaged in a "willful violation of a penal statute or ordinance." There is no factual basis to reach such a conclusion.
In determining whether an action is to be deemed "intentional" in nature, courts must ask whether the insured intended to cause the injury, not the act which caused such harm. See Prudential Property & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 169, 704 A.2d 597 (App. Div.1998); Merrimack Mutual Fire Ins. Co. v. Coppola, 299 N.J.Super. 219, 227, 690 A.2d 1059 (App.Div.1997).
New Jersey Court Rule 4:46-2 provides that a court should grant summary judgment when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."
In Brill v. The Guardian Life Ins. Co., the Supreme Court declared that while raising a genuine issue of material fact would preclude summary judgment, "a non-moving party cannot defeat a motion for summary judgment merely by pointing to any fact in dispute." 142 N.J. 520, 529, 666 A.2d 146 (1995).
The Court emphasized the underlying purpose of this legal tool:
[Summary judgment] is designed to provide a prompt, businesslike and inexpensive method of disposing of any cause which a discriminating search of the merits in the pleadings, depositions and admissions on file, together with the affidavits submitted on the motion clearly shows not to present any genuine issue of material fact requiring disposition at trial.
Id. at 530, 666 A.2d 146.
This standard has been satisfied with regard to Villa Enterprises' motion seeking summary judgment on the issue of coverage under the comprehensive general liability policy.
While the court is satisfied with Villa Enterprises' claim for coverage, it is not persuaded by its bad faith claim. In its complaint, Villa Enterprises charges *1189 that Federal had no reasonable basis for denying coverage. While the denial is determined to have been inappropriate, it was nevertheless not unreasonable under the circumstances, particularly in light of foreign caselaw.
The Supreme Court established the governing standard in Pickett v. Lloyd's, 131 N.J. 457, 621 A.2d 445 (1993). As a matter of law, a claim of bad faith lodged against an insurer will not be sustained if the policy interpretation is "fairly debatable." Id. at 473, 621 A.2d 445, quoting Bibeault v. Hanover Insurance Co., 417 A.2d 313, 319 (R.I.1980). The Court was clear in enunciating this standard:
To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. [Id.]
Here, no reported decisions in New Jersey addressed the scope of advertising injury coverage. Foreign jurisdictions have taken a narrow view of such coverage. Federal advocated a definition of "title" earlier adopted in California. Clearly, Federal was not acting in derogation of well settled New Jersey law. Although it ultimately did not prevail on its position, it was not such an obviously incorrect one that the court felt it could readily be resolved with an immediate decision on the bench at the end of oral argument. Villa Enterprises has offered no other evidence to support an allegation of bad faith. As the Pickett Court directs, this burden rests with the insured. Id. Having failed to meet that burden, the plaintiff's bad faith claim is dismissed.
Finally, plaintiff's claim for punitive damages is also without merit. The Punitive Damages Act provides the standard for this determination. N.J.S.A. 2A:15-5.12. The Act provides:
Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.
There has been no evidence offered to support a finding that Federal's denial of coverage was fueled by such intentional motivations.
In Sandler v. Lawn-A-Mat Chemical & Equipment Corp., the court addressed the appropriateness of punitive damages in the context of contract claims. 141 N.J.Super. 437, 358 A.2d 805 (App.Div.), cert. denied, 71 N.J. 503, 366 A.2d 658 (1976). The court stated:
In the absence of exceptional circumstances dictated by the nature of the relationship between the parties or the duty imposed by the wrongdoer, the concept of punitive damages has not been permitted in litigation involving breach of a commercial contract. [Id. at 449, 358 A.2d 805.]
An exception to this general rule, however, involves the existence of a fiduciary relationship, for instance an action by a seller against her real estate broker. Milcarek v. Nationwide Ins. Co., 190 N.J.Super. 358, 362, 463 A.2d 950 (App. Div.1983), citing Security Corp. v. Lehman Assoc., Inc., 108 N.J.Super. 137, 260 A.2d *1190 248 (App.Div.1970). Plaintiff has offered no evidence to suggest that Federal acted in this capacity. Accordingly, the claim for punitive damages is dismissed.

CONCLUSION
Federal provides no legally sufficient reasons for refusal to defend and indemnify its insured. Villa Enterprises paid its premiums in expectation of coverage should a claim arise. That expectation was reasonable. To deny coverage to an insured under such circumstances would surely undermine our governing jurisprudential policy standards.
Plaintiff has failed, however, to show that Federal's denial of coverage was made in bad faith. Similarly, plaintiff's claim for punitive damages is also without merit.
Summary judgment is therefore granted on the issue of Federal's obligation to defend and indemnify Villa Enterprises pursuant to the terms of its contract. Plaintiff's bad faith allegation and claim for punitive damages are without merit and hereby dismissed.
NOTES
[1] The relevant allegations in the pleading are:

5. Plaintiff is the owner of the service mark VILLA PIZZA, used in conjunction with restaurant, bar and lounge services in and around Las Vegas, and in Nevada.
6. Plaintiff is the owner of Nevada State trademark registrations for VILLA PIZZA and INSTANT REPLAY VILLA PIZZA SPORTS LOUNGE.
13. [P]laintiff has rights in and to the VILLA PIZZA service mark in and around Las Vegas and in Nevada which are superior to those of Villa Enterprises.
16. Plaintiff and its licensees have devoted substantial effort in advertising and promoting their services in and around Las Vegas, and have developed substantial recognition for the services offered under the distinctive VILLA PIZZA marks in the restaurant business.
17. Plaintiff's services have come to be well known and accepted by the purchasing public in conjunction with Plaintiff's use of its VILLA PIZZA marks, and those marks serve to distinguish Plaintiff's services from the services of others.
18. Plaintiff, through its own significant efforts, skill, and experience, and through the maintenance of superior quality of Plaintiff's services, has acquired and now enjoys substantial good will and a valuable reputation under its distinctive VILLA PIZZA marks.
19. Defendant Villa Enterprises is selling and advertising restaurant services competitive to those of Plaintiff by using Plaintiff's VILLA PIZZA mark in commerce in Las Vegas.
20. Defendant knew or should have known that selection and use of Plaintiff's VILLA PIZZA mark in or around Las Vegas would enable Defendant to trade on the extensive and valuable good will and reputation belonging to Plaintiff.
21. Defendant's use of Plaintiff's VILLA PIZZA mark in or around Las Vegas, for services identical to Plaintiff's, is likely to cause confusion, mistake, or deception among the relevant consuming public.
22. Defendant's advertising and sale of their services in or around Las Vegas under Plaintiff's distinctive VILLA PIZZA mark will cause the public mistakenly to believe that Defendant's services originate with or are sponsored by Plaintiff, or that they are offered under Plaintiff's supervision and control, and as a result Defendant's services are likely to be purchased as if they were offered or sponsored by Plaintiff.
[2] There the court noted that "advertising injury coverage has apparently been considered in this state in only one reported case ...." Tradesoft, supra, 329 N.J.Super. at 142, 746 A.2d 1078, citing FileNet Corp. v. Chubb Corp., 324 N.J.Super. 476, 735 A.2d 1203 (Law Div.), aff'd o.b., 324 N.J.Super. 419, 735 A.2d 1170 (App.Div. 1999).
[3] See, e.g., J.A. Brundage Plumbing and Roto-Rooter, Inc. v. Massachusetts Bay Ins. Co., 818 F.Supp. 553 (W.D.N.Y.1993), vacated by settlement, 153 F.R.D. 36 (W.D.N.Y.1994) (because the terms "title" and "slogan" were not defined in the policy, the court referred to Black's Law Dictionary for clarification); Sentex Systems, Inc. v. Hartford Accident & Indemnity Co., 882 F.Supp. 930 (C.D.Cal. 1995) (court relied on Black's Law Dictionary to define "title" when applying the term in the context of advertising injury); Union Ins. Co. v. The Knife Co., Inc., 897 F.Supp. 1213 (W.D.Ark.1995) (referencing Black's Law Dictionary to determine the meaning of "title" when considering advertising injury coverage).
[4] The Court noted that "New Jersey's courts have not yet addressed the specific issue of whether family oriented language in an auto insurance policy issued to a corporation renders the policy language ambiguous." 166 N.J. at 268, 765 A.2d 195.
[5] Grain Dealers Mut. Ins. Co. v. McKee, 943 S.W.2d 455 (Tex.1997); American States Ins. Co. v. C & G Contracting, Inc., 186 Ariz. 421, 924 P.2d 111 (Ct.App.1996); Foote v. Royal Ins. Co. of Amer., 88 Hawai'i 122, 962 P.2d 1004 (Haw.App.1998); Concrete Services, Inc. v. U.S. Fidelity & Guaranty Co., 331 S.C. 506, 498 S.E.2d 865 (1998); Peterson v. Universal Fire & Cas. Ins. Co., 572 N.E.2d 1309 (Ind.Ct. App.1991); Valentine v. Bonneville Ins. Co., 691 So.2d 665 (La.1997); Herrera v. Mountain States Mut. Cas. Co., 115 N.M. 57, 846 P.2d 1066 (1993); Sproles v. Greene, 329 N.C. 603, 407 S.E.2d 497 (1991); Meyer v. American Econ. Ins., 103 Or.App. 160, 796 P.2d 1223 (1990).
[6] Palmer v. Truck Ins. Exchange, 21 Cal.4th 1109, 90 Cal.Rptr.2d 647, 988 P.2d 568 (1999); Aloha Pacific, Inc., v. California Ins. Guarantee Ass'n, 79 Cal.App. 4th 297, 93 Cal. Rptr.2d 148 (2000).
[7] A certification mark is defined as: 
any word, name, symbol, or device used by a party or parties other than the owner of the mark to certify some aspect of the third parties' goods or services.
Terry E. Holtzman, Certification Marks: An overview, 81 Trademark Rep. 180 (1991).
Thus, a "certification mark is an unusual breed of mark which has been described as a `special creature' of trademark law." Id.
It performs a distinctly different function from that of a trademark, service mark or collective mark. It is not used by the owner nor is it used to identify and distinguish the goods or services of any one party. Rather, it is used only on the goods and services of others and serves as a guarantee that those goods and services meet the standards set by the certification mark owner.
Id.
Certification marks are thus entirely different from trademarked or service-marked titles or slogans and the carve out for the latter does not limit the exclusion of certification marks from coverage for advertising injury.
[8] The sole purpose of a collective mark, also called a "collective membership mark," is to indicate that the user of the mark is a member of an organization. See Lanham Act § 45, 15 U.S.C. § 1127; Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187 (3d Cir.1990); Huber Baking Co. v. Stroehmann Bros. Co., 252 F.2d 945, 952 (2d Cir.1958), cert. denied, 358 U.S. 829, 79 S.Ct. 50, 3 L.Ed.2d 69 (1958); National Trailways Bus System v. Trailway Van Lines, Inc., 269 F.Supp. 352 (E.D.N.Y. 1965). Collective marks are thus not affected by the carve out for trademarked or service-marked titles and slogans.
[9] It has been said that:

A trade name differs from a trademark in that a trademark identifies the source of a good or service, and a trade name is simply the name of a business or vocation. Although a trade name can eventually gain trademark status (for example, "McDonalds ®"), in general trade names are not federally registrable. [22 Am.Jur. Proof of Facts 3d% § 623 (1993)]
[10] Because coverage and the exception to the exclusion here are both limited to trademarked and service-marked titles and slogans and not titles and slogans generally, we do not face the conundrum created by the Palmer court's interpretation of the exclusionary clause as saving from exclusion "trade name titles and slogans."